SOUTHERN PACIFIC TRANSPORTA-
TION COMPANY, Pacific Motor Truck-
ing Company, and Silas F. Royster, Peti-
tioners,

v.

INTERSTATE COMMERCE COMMIS-
SION and the United States of
America, Respondents.

No. 75–2175.

·United States Court of Appeals,
Ninth Circuit.

Dec. 6, 1977.

Rehearing Denied Feb. 1, 1978.

John MacDonald Smith (argued), San Francisco, Cal., for petitioners.

Raymond M. Ripple (argued), San Francisco, Cal., for respondents.

Before KILKENNY, Senior Circuit Judge, ANDERSON, Circuit Judge, and SCHWARZER,* District Judge.

SCHWARZER, District Judge:

This is a proceeding under 28 U.S.C. § 2342 to set aside an order of the Interstate Commerce Commission. Under the terms of an order of the Commission served August 6, 1974, petitioners were required to cease and desist from engaging in or contracting for certain trucking operations within California, found by the Commission to be in violation of the Interstate Commerce Act. (*Southern Pacific Transportation Co., et al.—Investigation of Operations,* 120 M.C.C. 236 (1974).) Petitioners ask the Court to set aside that order, as well as a subsequent order of the Commission, dated May 5, 1975, denying a petition for reconsideration.

The essential facts are not disputed. Petitioner Southern Pacific Transportation Company contracts with Del Monte Corporation for transportation of large quantities of canned goods from Del Monte plants at San Jose and Emeryville, California, to a Del Monte warehouse at Stockton, California. During much of the year, transportation over these routes is performed either directly by Southern Pacific, employing its own rail facilities, or by Pacific Motor Trucking Company, a motor carrier subsidiary of Southern Pacific. However, during the peak of the canning season an unusually heavy demand is made upon these carriers by Del Monte, which has limited storage space at its San Jose and Emeryville canning plants and must therefore have its products shipped to Stockton for storage within a short time after packing. To meet this demand, requiring the deployment of as many as one hundred vehicles a day, Pacific Motor Trucking contracts for subhauling by truckers which for the most part do not hold interstate operating authority and do not comply with the rules and regulations applicable to interstate transportation.

The Commission held that the movements from the canning plants at Emeryville and San Jose to Stockton, although wholly within California, were nevertheless in interstate commerce and hence subject to its regulatory jurisdiction. It rested its conclusion on the fact that in most instances, the bills of lading covering the movements out of the canning plants carried notations which rendered the goods eligible for so-called transit privileges.

Transit credits or privileges are available to shippers under certain railroad tariffs. Their effect in substance is to give the shipper the benefit of the through rate between the point of origin and the point of destination even though the transportation may have been performed in separate segments by different carriers or may have been interrupted for the purpose of storage or processing. The through rate normally is lower than the sum of the local rates between the points of origin, stoppage and ultimate destination. In this case, this effect is achieved by the railroad's charging the shipper the through rate from the canning plant to the ultimate destination once the goods move out of the warehouse and allowing a credit for the freight charges paid for transportation of the goods from canning plant to warehouse. These credits are available regardless of whether the ultimate destination is interstate, intrastate or foreign.

The Commission, while acknowledging that transit provisions are not dispositive, held them to be a sufficiently significant factor in this case to convert seemingly intrastate movements into interstate movements:

While transit provisions are not dispositive of the issue, they are considered a strong indication that continuous transportation is intended, even when the effect is to convert a seemingly intrastate movement into an interstate one. Moreover because storage-in-transit has been

---

* The Honorable William W. Schwarzer, United States District Judge for the Northern District of California, sitting by designation.

recognized as a legal fiction under which otherwise separate movements may be artificially joined, factors which would, in its absence, indicate a lack of continuity, lose much of their significance. Thus, it is not fatal to a finding of continuous interstate transportation that a shipper may not know at the time of dispatch what the destination of a particular shipment will be, or even that a portion of the goods stored at the transit point may in fact move to intrastate points. It is sufficient that where, as here, the shipper employs the transit privilege for the movement of a significant volume of interstate traffic through the transit point under circumstances which indicate (1) more than a mere desire to preserve speculative reshipment privileges on essentially local traffic, (2) an attempt to avoid State regulation, or (3) an otherwise separate, rather than continuous, transportation, those shipments which do move to interstate destinations will be considered as affected with an interstate character *ab initio.* (120 M.C.C. at 246–247.)

In response to petitioners' argument that the liberal substitution-of-tonnage provisions of the tariff, under which transit credits could be applied to equivalent outbound tonnage without the necessity of tracing or matching up inbound and outbound shipments, precluded a determination that a particular shipment was intended for an interstate destination, the Commission stated:

> By respondents' own admissions, (1) the Stockton facility was employed during the peak canning season as a storage depot for canned goods, the vast majority of which were ultimately destined to out-of-State points and Canada, (2) the bills of lading applicable to the involved traffic bore a notation that the shipments were to be registered for transit with respondent railroad's tariff bureau, (3) the inbound freight charges were, in fact, applied to an equivalent amount of outbound canned goods traffic moving to interstate points, and (4) inasmuch as SP's tariffs describe the involved traffic as "foodstuffs, canned or preserved"

without further differentiation, the inbound and outbound tonnages were equivalent in all respects. Under the circumstances, it is of little significance that the ultimate destination of each individual shipment has not here been established, that a small portion of the freight stored at Stockton may have moved to California destinations, or that under the applicable substitution rules, some of the goods moving from the transit point were not physically the same as those moving inbound. (120 M.C.C. at 248.)

■ We have concluded that the Commission's order must be set aside. At the outset we note that the authority conferred upon the Commission by the Act is not coextensive with the plenary authority of Congress under the Commerce Clause, Art. 1, § 8, cl. 3 of the United States Constitution. As pointed out in *Tucker v. Casualty Reciprocal Exchange,* 40 F.Supp. 383 (N.D. Ga.1941), "the Act does not purport to regulate all acts and matters indirectly related to interstate transportation by motor carriers." The question before this Court is whether the transportation at issue was in interstate or foreign commerce within the meaning of Sections 203(c), 206(a) and 209(a) of the Interstate Commerce Act (49 U.S.C. §§ 303(c), 306(a), 309(a)).

■ As the Commission correctly states in its opinion,

> Whether transportation is interstate or intrastate is determined by the essential character of the commerce, *manifested by shipper's fixed and persisting transportation intent at the time of the shipment,* and is ascertained from all of the facts and circumstances surrounding the transportation. (120 M.C.C. at 242, emphasis added.)

The record establishes that the only intent manifested by the shipper in this case at the time of shipment (i. e., shipment from the canning plants) was to ship the goods to the warehouse for eventual transshipment to an as yet unknown destination —interstate, intrastate or foreign—and to assure their eligibility for transit credits

which were available regardless of whether the ultimate transshipment was interstate, intrastate or foreign.

The instant case is substantially on all fours with *Interstate Commerce Commission v. Columbus and G. Ry. Co.,* 153 F.2d 194 (5th Cir. 1946), in which a railroad engaged a truck owner to transport cotton from fields to warehouses within the same state, whence it was shipped to interstate destinations after a few months. As in this case, a transit credit was allowed for cotton shipped from the warehouse over defendant's railroad, but it was nonetheless held that the shipment to the warehouse was not in interstate commerce on the ground that the shipper of the cotton did not determine its ultimate destination until after it had reached the warehouse.

While it is true that nearly all of the canned goods shipped to the Stockton warehouse eventually moved to interstate and foreign destinations, that expectation is not sufficient to supply the requisite "fixed and persisting transportation intent at the time of the shipment." In *Memphis Merchants Exchange v. Illinois Central Railroad Co.,* 43 I.C.C. 378, 388 (1917), a case cited by the Commission, the controlling principle was stated as follows:

> The true and controlling intent which determines the essential character of the commerce is not fully matured and fixed until the party who, having the right so to do, decides, under the options lawfully available to him under the transit tariffs, what is to be the final destination of the shipment.
>
> In other words, the intent which is conclusive in determining the character of the completed transportation is not fully expressed or indicated until it is decided whether the shipment will be disposed of locally or the transit tariff provisions availed of for a further movement, treating the whole as a continuous shipment at the law through charge . ‥

It is not disputed that Del Monte, under the options available to it in the transit tariffs, did not decide the final destination of any shipment of goods until after the goods had come to rest in the Stockton warehouse. The fact that most of the goods in the warehouse were eventually shipped to interstate or foreign destinations is not sufficient to give rise to a fixed intent to engage in an interstate movement at the time the goods left the canning plants with their final destination still unknown. Inasmuch as the goods remained under Del Monte's control at the Stockton warehouse and were not committed to a common carrier for an interstate or foreign movement until they left that warehouse, the requisite intent which governs the character of the movement was not formed until shipment from Stockton.

The cases cited by the Commission with one arguable exception support that conclusion. In *Rush Common Carrier Application,* 17 M.C.C. 661 (1939), shipments of ore under a transit privilege were held to be subject to Commission jurisdiction. In that case, however, the motor carrier received ore under a consignment for interstate shipment. The ore was then transferred directly from the applicant's trucks into rail cars in which it was transported out-of-state. Those facts clearly distinguish *Rush* from the present case in that the ore was not returned to the shipper's possession or control before leaving the state and was from the outset the subject of a contractual commitment for interstate shipment. Furthermore, the Commission made reference in the *Rush* opinion to the differing fact situation of *Surles Contract Carrier Application,* 4 M.C.C. 488 (1938), a case in which merchandise was shipped interstate to Texas by railroad and subsequently trucked to stores. Some of the goods were in the interim stored in a Texas warehouse, whereas others were trucked directly from the rail cars to the outlets. Nonetheless, the Commission held that the distribution by truck was intrastate and not subject to its jurisdiction on the ground that the goods were not committed to specific distribution points until after they had completed their interstate journey. Thus, the *Rush* opinion recognized distinguishing criteria which, applied here, would render the transportation intrastate.

In *Railroad Commission of Texas v. Oil Field Haulers Association,* 325 I.C.C. 697 (1965), the Commission held that where pipe was shipped into Texas by manufacturers and there transferred to oil companies, the whole movement was interstate transportation despite stoppage in transit within Texas. In that case, however, the pipe was not consigned to shipper warehouses for storage in transit but rather was stored in yards operated by the carriers pending delivery, as was pointed out by the Commission, 325 I.C.C. at 705–706:

> It should be emphasized that unlike the common transit arrangements wherein the commodity is transited in a public warehouse or the warehouse of a shipper here the storage-in-transit is completely within the control of a defendant [carrier] . . . ..

The Commission also cites *Baltimore & Ohio South-Western Railroad Company v. Settle,* 260 U.S. 166, 173, 43 S.Ct. 28, 31, 67 L.Ed. 189 (1922), in which the Court stated:

> The instances are many where a local shipment follows quickly upon an interstate shipment and yet it is not to be deemed part of it, even though some further shipment was contemplated when the original movement began. Shipments to and from distributing points often present this situation, if the applicable tariffs do not confer reconsignment or transit privileges.

The Commission, while recognizing that the statement was only dictum, points to the qualifying phrase in the last sentence. (120 M.C.C. at 243.) But in *Settle* the Court refused to find that a break in transportation ended interstate commerce on the strength of the shipper's admission that the stoppage was solely for the purpose of taking advantage of a combination of rates which, in that case, happened to be lower than the interstate through rate to the same destination. The Court, moreover, added immediately following the language quoted by the Commission:

> The distinction is clear between cases of that character and the one at bar, where the essential nature of the traffic as a through movement to the point of ultimate destination is shown by the original and persisting intention of the shippers which was carried out.

Relevant to this holding is an observation of the concurrence in *Rush Common Carrier Application,* 17 M.C.C. at 677:

> In a number of these cases, there was an element of fraud, or at least of subterfuge, in attempting to avoid the higher interstate charges . . . ..

In the instant case there is of course no suggestion of fraud or subterfuge.

Finally, the Commission cites *Baltimore and Ohio Railroad Company v. United States,* 24 F.Supp. 734 (N.D.N.Y.1938), which involved an attempt to manipulate rates not unlike that in *Settle,* except that there it was the carrier which attempted to evade a through rate. Finding that the railroad arbitrarily alternated between through rates and higher "two-factor" rates in similar situations, the court upheld a Commission decision that through rates only should apply. However, the result in that case turned solely on the railroad's unequal application of its tariffs, since the court remarked that had the carriers been consistent in adhering to the two-factor rates, "they would have been on firm ground." (24 F.Supp. at 737.)

The only case cited which arguably supports the Commission's present view is *Alterman Transport Lines, Inc., Ext.—Florida,* 81 M.C.C. 781 (1959). That case involved the question whether operating authority from the Commission was required for the transportation of meat products and animal hides from Florida points to ports and intransit storage points within Florida. Certain of the shipments which moved to the ports for export were identifiable as such from the beginning of the movement and could have been considered as having been committed to foreign commerce from the outset. With respect to the transit movements whose interstate destination was determined only after the movement began, the Commission did adopt the position which it expressed in the instant case, that the application of transit privileges

transforms an initial intrastate movement into an interstate movement, a view which we reject here.

The Commission in its opinion below rejects as inapplicable the line of decisions involving the limits of the states' power to tax goods which eventually move into interstate commerce. Although the considerations in those cases are not in all respects the same, they are relevant because they lay down the constitutional limits of interstate commerce. Thus, in the leading case of *Coe v. Errol,* 116 U.S. 517, 525, 6 S.Ct. 475, 477, 29 L.Ed. 715, the Supreme Court held:

> When the products of the farm or the forest are collected and brought in from the surrounding country to a town or station serving as an entrepot for that particular region, whether on a river or a line of railroad, such products are not yet exports, nor are they in process of exportation, nor is exportation begun until they are committed to the common carrier for transportation out of the State to the State of their destination, or have started on their ultimate passage to that State.

And in *Federal Compress Co. v. McLean,* 291 U.S. 17, 54 S.Ct. 267, 78 L.Ed. 622 (1934), a Mississippi license tax on a cotton warehouse was upheld, even though all but a negligible part of the cotton sent to the warehouse was ultimately shipped to points outside the state, and moved under through rather than a combination of local rates from point of origin to final destination, the Court stating that: "It is clear by all accepted tests the cotton, while in appellant's warehouse, has not begun to move in interstate commerce . . .." 291 U.S. at 21, 54 S.Ct. at 268. See, also, *Sumitomo Forestry Co., Ltd., of Japan v. Thurston County,* 504 F.2d 604, 609, n. 7 (9th Cir. 1974).

The Commission seeks to support its decision by reasoning that

> . . . respondents cannot claim that the movements in question are interstate for rate purposes (i. e., when shippers claim the transit privilege to obtain the benefit of the through interstate rates)

and, on the other, that they are intrastate for the purpose of determining this Commission's jurisdiction with respect to the railroad's relationship to its underlying carriers. (120 M.C.C. at 241.)

While the apparent logic of this argument has a certain superficial appeal, it must fail in the face of the fact that, as the Commission concedes, we deal here with a fiction. As pointed out above, the broad substitution privilege under the tariff results in a situation where, in the normal course, transit credits earned on a particular inbound shipment of goods are applied against an entirely different outbound shipment. The Commission itself observes that "The substitution privilege, which authorizes the application of credits earned on inbound shipments to outbound shipments of equivalent character in lieu of the identical goods, is, like transit itself, a fiction, the commercial utility of which has been recognized and approved by the Commission since the earliest days of regulation." (120 M.C.C. at 247.) And it recognizes that in certain cases, the Commission has "treated the pre-transit and post-transit movements as separate and distinct." (120 M.C.C. at 248.)

Consequently, there are no compelling reasons of legal symmetry or logic which would justify departure from the well-established standard for determining whether transportation is in interstate commerce. There are, on the other hand, considerations of administrative feasibility and fairness which militate strongly in favor of adherence to that standard. Inasmuch as it cannot be determined whether goods are committed to interstate or foreign commerce until they are shipped from the warehouse, the Commission's decision would lead to retroactive imposition of its jurisdiction, turning on whether particular goods are committed to interstate or foreign commerce upon subsequent shipment. That kind of an approach to the problem of determining regulatory jurisdiction is certain to breed conflicts between state and federal authorities, with shippers and carriers caught in the middle exposed to costly confusion. This problem was long ago recognized by

the Supreme Court in *Gulf, Colorado & Santa Fe Railway Company v. Texas,* 204 U.S. 403, 413, 27 S.Ct. 360, 363, 51 L.Ed. 540 (1907), when it posed the question:

. . . if the only contract of shipment was for local transportation, would the state law in respect to the mode of transportation be set one side by a Federal law in respect to interstate transportation on the ground that the shipper intended after the one contract of shipment had been completed to forward the goods to some place outside the State?

Holding that the transit shipments at issue were subject to state jurisdiction, not the Commission's, the Court answered that question in the negative, stating:

In many cases it would work the grossest injustice to a carrier if it could not rely on the contract of shipment it has made, know whether it was bound to obey the state or Federal law, or obeying the former, find itself mulcted in penalties for not obeying the law of the other jurisdiction, simply because the shipper intended a transportation beyond that specified in the contract, it must be remembered that there is no presumption that a transportation when commenced is to be continued beyond the state limits and the carrier ought to be able to depend upon the contract which it has made and must conform to the liability imposed by that contract. (204 U.S. at 414, 27 S.Ct. at 363.)

For all of the foregoing reasons, we conclude that Del Monte's shipments from its plants in San Jose and Emeryville to its warehouse in Stockton, where the goods remain under Del Monte's control and have not yet been committed to a carrier for interstate or foreign movement, do not cease to be in intrastate commerce by reason of the fact that they are subject to transit privileges.

Accordingly, the decision and order of the Commission are set aside.