530 A.2d 987

National Retail Transportation, Inc., Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Argued December 8, 1986, before Judges DOYLE and PALLADINO, and Senior Judge BARBIERI, sitting as a panel of three.

*Edward L. Ciemniecki,* with him, *James W. Patterson, Rubin, Quinn & Moss,* for petitioner.

*Alan Kohler,* Assistant Counsel, with him, *Michael C. Schnierle,* Deputy Chief Counsel, and *Charles F. Hoffman,* Chief Counsel, for respondent.

*Christian V. Graf,* with him, *David H. Radcliff, Graf, Knupp & Andrews, P.C.,* for intervenor, Silver Line, Inc.

OPINION BY JUDGE PALLADINO, September 1, 1987:

National Retail Transportation, Inc. (NRT) petitions for review of an order of the Pennsylvania Public Utility Commission (PUC) which adopted an Administrative Law Judge's initial decision and ruling on exceptions sustaining a complaint filed by Silver Line, Inc. (Silver Line) and denying NRT's application seeking additional common carrier operating rights.

NRT, on January 25, 1982, was granted operating rights as a Class D carrier by the PUC to transport dresses or dress materials, clothing, garments and garment materials and supplies used in the manufacture thereof between points in Pennsylvania located in and east of the counties of Tioga, Lycoming, Clinton, Centre, Huntingdon and Fulton. These operating rights were subject to two conditions:

> Provided that no right, power or privilege is granted to provide service between cutting, sewing, assembly and manufacturing plants between points in the counties of Lehigh, North-

ampton, Carbon, Monroe, Luzerne, Schuylkill and Lackawanna.

Provided that no right, power or privilege is granted to transport clothing or wearing apparel on hangers, hanger packs and flat packs, in vehicles specially equipped with stationary hanger racks, from points in the city and county of Philadelphia to retail stores located within an airline distance of twenty-five (25) statute miles of the Philadelphia City Hall.

The second restriction enumerated above, upon application by NRT, was removed by the PUC on November 29, 1983. NRT filed an additional application in 1983 to amend its certificate by having the first restriction removed so as to obtain the authority to transport dresses or dress materials, etc., between garment-producing facilities within the seven northeastern Pennsylvania counties of Lehigh, Northampton, Carbon, Monroe, Luzerne, Schuylkill and Lackawanna (seven counties). This application was protested by two carriers: International Distribution Centers, Inc. (IDC) and Silver Line, Inc. (Silver Line).

On July 5, 1983, IDC filed a Complaint against NRT alleging that NRT had been providing service within the seven counties which was illegal[1] and beyond the

---

[1] The complaint alleged that such transportation was in violation of Sections 1102 and 2503 of the Public Utility Code (Code), 66 Pa. C. S. §§1102, 2503.

Section 1102 provides in pertinent part:

(a) General rule.—Upon the application of any public utility and the approval of such application by the commission, evidenced by its certificate of public convenience first had and obtained, and upon compliance with existing laws, it shall be lawful:

(1) For any public utility to begin to offer, render, furnish or supply within this Commonwealth service of a

scope of its existing authority. Because of similarity of facts and issues, the Administrative Law Judge consolidated the application and complaint proceedings. Five hearings were held between August, 1983 and April, 1984. On July 11, 1984, NRT filed a Motion to Partially Dismiss the Application on Jurisdictional Grounds. On April 15, 1985, the Administrative Law Judge denied NRT's Motion to Partially Dismiss the Application on Jurisdictional Grounds, concluding that the transportation at issue was intrastate and therefore under the jurisdiction of the PUC. The Administrative Law Judge also sustained the Complaint and fined NRT, holding that NRT violated Section 1102 of the Code in performing three acts of unauthorized transportation. In addition, the Administrative Law Judge concluded that NRT had not met its burden of proving public need for the service and fitness of NRT to provide such service. Accordingly, the Administrative Law Judge denied the application for lack of proof of need and fitness.

NRT timely filed exceptions to the Initial Decision of the Administrative Law Judge who denied said exceptions concluding that no new considerations were offered by NRT which altered the findings and conclusions set forth in the Initial Decision. NRT then ap-

---

different nature or to a different territory than that authorized by:

(i) A certificate of public convenience granted under this part. . . .

Section 2503 provides in pertinent part:

(a) General rule.—No person or corporation shall render service as a contract carrier by motor vehicle unless there is in force with respect to such carrier a permit issued by the commission, authorizing such person or corporation to engage in such business. The application for such permit shall be determined by the commission in accordance with the provisions of subsection (b), except as set forth in subsection (d).

pealed to the PUC which, by order of July 29, 1985, denied NRT's appeal and adopted the Initial Decision and Ruling on the Exceptions. Thereafter, NRT filed a Petition for Rescission and Reopening and a Petition for Stay of the PUC's Order. Both of these Petitions were denied by the PUC.

On appeal to this court, NRT argues: 1) that the PUC committed an error of law in assuming jurisdiction because the transportation at issue was interstate and not intrastate in nature; 2) that the PUC erred by excluding evidence of need of the transportation services because of the conclusion that the illegal service rendered by NRT was done so in bad faith; and 3) that the PUC erred in concluding that NRT lacked the propensity to operate legally and therefore was not fit.

Our review in the instant appeal is limited to a determination of whether the PUC's decision to affirm the order of the Administrative Law Judge was based upon an error of law or unsupported by substantial evidence. *Seaboard Tank Lines, Inc. v. Pennsylvania Public Utility Commission,* 93 Pa. Commonwealth Ct. 601, 502 A.2d 762 (1985). Further, we must accept the PUC's exercise of its discretion in making rules, regulations, findings and determinations unless unsupported by the record or based upon an error of law. *Id.*

NRT first contends that the service it admitted to providing within the seven counties is part of an overall continuous movement in interstate commerce and, therefore, beyond the regulatory jurisdiction of the PUC. NRT contends that the test to be applied to determine whether a pattern of transportation is interstate is the "fixed and persisting intent of the shipper at the time of shipment." *Southern Pacific Transportation Co. v. Interstate Commerce Commission,* 565 F.2d 615, 617 (9th Cir. 1977). Accordingly, NRT argues that the service provided by NRT within the seven counties is in-

terstate in nature because it was intended by the shipper to originate and terminate at points beyond Pennsylvania.

The transportation scheme involved in the instant appeal generally begins with rolls of material picked up by motor carriers at textile mills or distributors primarily located in New Jersey, New York, North Carolina or South Carolina. The rolls of materials are then transported to garment factories and "cutting rooms" located throughout the seven counties. The rolls of materials are spread and cut in the cutting rooms. A portion of material is then transported from the cutting rooms to "trim houses" where accessories such as piping, zippers, belts, covered buttons and other items, are made for use on the finished garment. The cut work and the "trim" are then transported from cutting rooms and trim houses to sewing or assembly facilities to produce a finished garment.

In a significant majority of instances, the finished garments are transported out of Pennsylvania to New York. Often the original out-of-state shipper (manufacturer) does not know the ultimate retail customer for the finished garment when the rolls of material are shipped into Pennsylvania. However, the manufacturer's primary intent is for the finished garments to be shipped out of Pennsylvania upon completion of the manufacturing process.

The PUC argues that the flow of interstate commerce is interrupted by manufacturing processes which materially change the character, utility and value of the transported goods. *Arkadelphia Milling Co. v. St. Louis Southwestern Railroad Co.*, 249 U.S. 134 (1919). NRT argues, however, that to solely focus on the changed nature of the goods is an erroneous interpretation of *Arkadelphia* because the controlling factor is the shipper's specific intent to continue transportation into another

state. Therefore, NRT, citing *Southern Pacific Terminal Co. v. Interstate Commerce Commission,* 219 U.S. 498 (1911), argues that a temporary stoppage for the processing of goods is not sufficient to change interstate commerce to intrastate movement.

The cases of *Southern Pacific Terminal Co.* and *Arkadelphia* both rely upon the Supreme Court's decision in *Coe v. Town of Errol,* 116 U.S. 517 (1886). In *Coe,* the Supreme Court enunciated the principle that the process of exportation begins when goods are committed to a common carrier for transportation out of the originating state to their state of destination or when the ultimate passage to that state has begun. Such transportation is to be in a continuous route or journey. *Id.* Our inquiry then, is to determine when the process of exportation begins and whether it is continuous.

In *Southern Pacific Terminal Co.,* the Supreme Court was faced with a transportation scheme in which cottonseed cake was purchased at points in various states including Texas, and shipped to a terminal in Galveston, Texas where the cottonseed cake was processed into meal and sacked for export. The Supreme Court rejected the argument that the ICC did not have jurisdiction over the transportation because interstate commerce was not involved since, at Galveston, the goods reached a final point of concentration and manufacture. This case, because of its unique factual basis, does not negate the principle, that a change in the nature of goods, by processing or manufacturing, followed by subsequent transportation can change interstate commerce to intrastate commerce. Specifically, the Supreme Court stated:

> In other words, the manufacture or concentration on the wharves of the terminal company are but incidents, *under the circumstances presented by the record,* in the transhipment of the

products in export trade, and their regulation is within the power of the Interstate Commerce Commission.

219 U.S. at 526 (emphasis added).

*Arkadelphia,* however, is factually more similar to the case at bar:

When the rough material reached the mills, it was manufactured into finished staves, headings and hoops, and in this condition shipped to whoever purchased them. The purchaser uses them in making barrels, casks, etc. The wastings in the finishing of said articles from the rough material were either disposed of for firewood, or destroyed. When the rough material left the woods, a bill of lading was issued from the woods to the mill. When the rough material reached the mill, it was finished into some or all of the articles described, when it was stacked in the yards or placed in kilns to dry. The process of manufacturing and drying occupied several months, or on an average this process would be gone through with, the finished products sold and shipped to the purchaser, in about five months from the date the rough material was received at the mill. The claimants classified the different parts after they came from the mill completely finished, and made sales from such stock. The markets for the manufactured articles were almost altogether in other states than Arkansas, or in foreign countries, and about 95 per cent. of the sale of finished articles, that is, of the total outbound shipments, were made for delivery at points outside the state of Arkansas, the remaining 5 per cent. being sold and delivered, or shipped to points within the state of Arkansas. At the time the rough material was shipped

to the mills, the mills did not know to whom they would sell the finished product, or to what points it would be shipped, but did know that there was little market for the finished articles in the state of Arkansas, and expected that they would sell 95 per cent. of said finished articles and ship them to points outside the state of Arkansas.

It was the intention of all the claimants herein, at the time they shipped the rough material in to the milling points, to mill said rough material with the object of selling the said finished product and shipping it out as soon as practicable, and all of them knew and intended at the time they brought the rough material into the mill, on account of previous course of dealings in the business, that 95 per cent. of the finished product would be by them shipped to points outside the state of Arkansas.

The claimants paid the usual property tax to the state of Arkansas on their stock of materials on hand at the milling point, whether said stock was in the rough or finished, the amount of the tax being arrived at according to the methods in use in the state of Arkansas by the use of an average basis.

249 U.S. at 150-151. The Court then held that it was error to treat the movement of the rough lumber from the woods to the milling point as interstate commerce.

It is not merely that there was no continuous movement from the forest to the points without the state, but that when the rough material left the woods *it was not intended that it should be transported out of the state, or elsewhere beyond the mill, until it had been subjected to a manufacturing process that materially changed its*

*character, utility, and value.* The raw material came to rest at the mill, and after the product was manufactured it remained stored there for an indefinite period—manufacture and storage occupying five months on the average—for the purpose of finding a market. Where it would eventually be sold no one knew. *And the fact that previous experience indicated that 95 per cent. of it must be marketed outside of the state so that this entered into the purpose of the parties when shipping the rough material to the mill, did not alter the character of the latter movement.*

*Id.* at 151 (emphasis added).

As is apparent, whether transportation is interstate or intrastate is determined by the essential character of the commerce, manifested by a shipper's fixed and persisting intent at the time of the shipment which is ascertainable from all of the facts and circumstances surrounding the transportation scheme. *Southern Pacific Transportation Co. v. Interstate Commerce Commission,* 565 F.2d 615 (9th Cir. 1977). The intent of the shipper to be considered is his present as distinguished from his ultimate intent. *United States v. Majure,* 162 F. Supp. 594 (S.D. Miss. 1957).

In the case at bar, the manufacturer moves rolls of material through interstate commerce into Pennsylvania with the ultimate intent to move the goods to other states. However, upon arrival in Pennsylvania, the present intent of the manufacturer is that this material is not to leave Pennsylvania until it is subjected to several processes which change the rolls of material into finished garments. This process, undoubtedly, changes the character, utility and value of the rolls of material. Although a shipment does not lose its character as interstate commerce when, for reasons of necessity or

convenience, the course of the shipment is interrupted, delivery of a product into a state ceases being in interstate commerce when it has to come to rest at a given point. *Blackmore v. Puzerc Service Commission,* 120 Pa. Super. 437, 183 A. 115 (1935). Here, the manufacturing process employed under the direction of the shipper, evidences the fact that the rolls of materials came to rest in Pennsylvania thereby destroying the continuity required to sustain a finding of interstate commerce. Subsequent transportation between various facilities within the seven counties was no longer interstate but was intrastate and subject to the jurisdiction of the PUC. The fact that the majority of the finished garments would be marketed in States other than Pennsylvania does not alter the character of the previous intrastate commerce. *Arkadelphia.* We hold, therefore, that the PUC did not commit an error of law by concluding that NRT's transportation of goods within the seven counties was intrastate and subject to the PUC's jurisdiction.

NRT next contends that the PUC erred by excluding evidence of need for the applied for transportation services because, as concluded by the PUC, NRT actually rendered illegal services in bad faith.[2] NRT admits to providing service within the seven counties which was beyond its authority but argues that it was rendered in NRT's good faith belief that the service was interstate commerce. NRT asserts, therefore, that it was not in violation of its intrastate operating authority.

It is well settled that an applicant for common carrier authority, who has provided unauthorized services in the past, cannot sustain its burden of proving the need

---

[2] Section 1103 of the Code, 66 Pa. C. S. §1103, states that a certificate of public convenience shall be granted by the PUC "only if the commission shall find or determine that the granting of such certificate is necessary or proper for the service, accommodation, convenience, or safety of the public."

for service through evidence of an illegal course of conduct if such conduct represents a bad faith violation of the Code or the PUC's regulations or orders. *Manganell v. Pennsylvania Public Utility Commission,* 18 Pa. Commonwealth Ct. 373, 335 A.2d 890 (1975). The burden of proving good faith is upon the applicant who has allegedly operated illegally and this burden must be met with clear and convincing evidence. *Id.* Whether prior violations were excusable is primarily a matter for the PUC. *Daily Motor Express v. Pennsylvania Public Utility Commission,* 183 Pa. Super. 120, 130 A.2d 234 (1957). Evidence of illegal activity deliberately rendered by the applicant and related shipper testimony is improper for consideration by the PUC and must be excluded. *Armored Motor Service Corporation v. Pennsylvania Public Utility Commission,* 49 Pa. Commonwealth Ct. 623, 411 A.2d 900 (1980) citing *Bunting Bristol Transfer, Inc. v. Pennsylvania Public Utility Commission,* 418 Pa. 286, 210 A.2d 281 (1965).

In the case at bar, the Administrative Law Judge concluded that NRT violated the Code and that NRT did not produce clear and convincing evidence that the violations were the result of a bona fide misunderstanding of its operating authority. The Administrative Law Judge then excluded the testimony of several shippers produced by NRT as proof of need of service because NRT had provided those shippers with illegal service. The Administrative Law Judge's finding of bad faith must be upheld if supported by substantial evidence.

NRT contends that they relied upon advice of their former counsel, Richard Rueda, which produced a bona fide misunderstanding of its rights and its subsequent provision of illegal services. The Administrative Law Judge specifically rejected this contention, noting that NRT's vice-president testified as to why NRT provided the illegal service: "Because it is a necessary part of

what we do for our customers." N.T. at 78. In addition to testimony at the hearings, the Administrative Law Judge considered the history of the proceedings:

Much more convincing evidence harmful to applicant surfaces in its administrative history before this Commission as illustrated by the following:

At the initial hearing on the original application on March 21, 1981, applicant voluntarily offered two restrictive amendments to induce withdrawal of protests, with the first amendment containing the restriction on the current certificate prohibiting service in the seven counties comprising the current proposed application area. On the basis of said amendments, the protests were withdrawn and the application granted with the restrictions in force. Applicant accepted its initial grant with no indication that it considered part of the authority beyond the jurisdiction of this Commission.

Subsequently, on December 20, 1982, applicant filed a second application at Folder 1, Amendment A, to remove the two previously mentioned restrictions, lending credence that it deemed itself bound by the restrictions. If, therefore, applicant believed that the transportation in controversey [sic] was without the jurisdiction of this Commission, it could or would have availed itself of other procedural devices rather than an application.

Applicant again, by the present application, sought to remove the restrictions. The present application at Amendment B was filed on April 18, 1983 and it was not until July [sic] 1984 that applicant filed its Motion to Partially Dismiss

the Application on Jurisdictional Grounds, long after the 'cat had been let out of the bag.' Because the Administrative Law Judge's finding of bad faith was supported by substantial evidence of record, we will not disturb it on appeal. As a result, the Administrative Law Judge properly excluded testimony from those to whom NRT supplied unauthorized service.

This excluded testimony was produced by NRT so as to meet its burden of proving need for the service. The remaining evidence proffered by NRT was found to be insufficient to support a finding that the service was needed by the public. This determination by the Administrative Law Judge was a credibility determination. We will not interfere with the discretion of the PUC. *Seaboard Tank Lines.*

Lastly, NRT contends that the PUC erred in its conclusion that NRT lacked the propensity to operate legally. This finding was based on the fact that NRT had been fined numerous times for rendering illegal service and failing to file required documents. It was in the discretion of the PUC to determine NRT's propensity to operate legally and this determination is supported by the record.

We find the order of the PUC to be amply based upon substantial evidence and free of legal error. Accordingly, the order of the PUC is affirmed.

## ORDER

AND NOW, September 1, 1987, the order of the Pennsylvania Public Utility Commission in the above-captioned matter is affirmed.