554 A.2d 137

Pittsburgh-Johnstown-Altoona Express, Inc., Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Argued October 31, 1988, before Judges CRAIG and PALLADINO, and Senior Judge NARICK, sitting as a panel of three.

*Christian V. Graf*, with him, *David H. Radcliff, Graf, Andrews & Radcliff,* and *Arthur J. Diskin,* for petitioner.

*Karen Oill Moury,* Assistant Counsel, with her, *H. Kirk House,* Deputy Chief Counsel, and *Daniel P. Delaney,* Chief Counsel, for respondent.

*John A. Pillar, Pillar and Mulroy, P.C.*, for intervenors.

OPINION BY JUDGE CRAIG, January 31, 1989:

Pittsburgh-Johnstown-Altoona Express, Inc. (PJAX or carrier), a common carrier by motor vehicle, holding certificates of public convenience issued by both the Pennsylvania Public Utility Commission (PUC or commission) and the federal Interstate Commerce Commission (ICC), has petitioned for review of an opinion and order of the PUC that imposed a fine of $28,040 on PJAX and suspended its PUC-issued certificate of public convenience for a period of 120 days.

This case began with a complaint filed with the PUC against PJAX by Newcomer Trucking, Inc., Pitt-Ohio Express, Inc. and Hammel's Express, Inc. (complainants). The original complaint and a later amendment alleged numerous specific instances of transportation of goods by PJAX between points within Pennsylvania, assertedly without appropriate authority from the PUC and in violation of a "Settlement Stipulation" which PJAX had very recently signed to resolve an earlier complaint involving the same parties, among others, in which PJAX had acknowledged that it lacked PUC authority to serve a long list of specific areas in Pennsylvania and had agreed not to serve those areas.

After some initial unresponsive answers, PJAX ultimately admitted performing all of the service alleged, but PJAX raised the affirmative defense that all of it was legal. As the commission and the complainants (intervenors on this appeal) note, the burden of proof as to an affirmative defense rests with the party asserting that defense. *Baldwin v. Devereux Schools*, 302 Pa. 569, 154 A. 21 (1931).

The Administrative Law Judge (ALJ) who heard the case determined that the complainants proved a total of 1,352 violations of the Public Utility Code; he assessed fines of $20 per violation or $27,040. In addition, the ALJ imposed a penalty of $1,000 for discovery violations com-

mitted by PJAX in the course of the proceedings before him.

The PUC denied exceptions filed by both sides to the ALJ's initial decision and adopted that initial decision in an opinion and order entered July 28, 1988. By order entered August 23, 1988, the commission denied the petitions of both PJAX and the complainants for reconsideration.

The issues presented are:

(1) Whether the PUC had jurisdiction to determine that shipments found to have been made between points in Pennsylvania but through another state were not legitimate exercises of a carrier's ICC authority, where the carrier possessed an ICC certificate that facially authorized such shipments and asserted a business justification for its practices that might conceivably be upheld, or whether jurisdiction to make such a determination lay with the ICC in the first instance;

(2) Whether the PUC erred by concluding that traffic handled for four specific companies constituted pooling arrangements that require PUC authority, rather than pool truck distribution traffic validly transported in interstate commerce;

(3) Whether the PUC had jurisdiction to determine that shipments the carrier made from warehouses in Allegheny County to other points in Pennsylvania were not legitimate exercises of its interstate authority where the goods arrived from out of state, were stored for an indefinite period at the warehouses, and then were directed to their ultimate destinations by the owners of the goods; and

(4) Whether the PUC correctly determined that certain concededly intrastate shipments were performed without proper PUC authority, where the carrier had entered into a Settlement Stipulation listing numerous areas that it could not serve and agreed not to serve,

despite the carrier's claim of other PUC-granted authority.

Our scope of review of a PUC order generally is limited to determining whether there was a violation of constitutional rights or an error of law and whether the findings of the agency are supported by substantial evidence. *Chappell v. Pennsylvania Public Utility Commission*, 57 Pa. Commonwealth Ct. 17, 425 A.2d 873 (1981).

## 1. SHIPMENTS BETWEEN POINTS IN PENNSYLVANIA THROUGH ANOTHER STATE

PJAX operates five terminals. The main terminal is in Pittsburgh, and it has been operational since February, 1984. Other terminals are located in Baltimore, Maryland (established in August, 1984), Cleveland, Ohio (established in August, 1985), Niles, Ohio (established in May, 1987) and Harrisburg (established in October, 1987). From Pittsburgh PJAX operates "Peddle"[1] runs to Morgantown, Weirton, Wheeling and Parkersburg, all in West Virginia, to Cumberland, Maryland, and to two New York locations. The trucks are loaded in Pittsburgh, proceed to the above areas, make deliveries and occasional pickups there, make pickups and deliveries within various Pennsylvania counties (Fayette, Greene, Beaver, Washington, Bedford, Fulton and Bradford) and then return to Pittsburgh.

In addition, road runs operate from Pittsburgh to Baltimore, Cleveland and Niles. At the Baltimore terminal the road run from Pittsburgh is broken down, consolidated with freight brought in from points in Maryland, Virginia, West Virginia and the District of Columbia and then distributed to points· in southeastern and south central Pennsylvania. The trucks make pickups and de-

---

[1] Peddle runs are those where a truck loads at a terminal and proceeds to a designated area, making deliveries and pickups along the way. *See* Initial Decision, pp. 54-55; R. 1014a-15a.

liveries in those areas. The pickup freight returns to Baltimore and then proceeds to Pittsburgh on a road run. The Cleveland terminal collects freight from points in Ohio and New York and from the Pittsburgh road run. The trucks from there then make deliveries and pickups in the areas of Erie, Meadville and Warren. The Niles terminal delivers freight from areas in Ohio and from the Pittsburgh road run, making pickups and deliveries in the areas of Oil City, Franklin, Clarion-Kitanning, Butler, New Castle, Midland, Beaver and Shippingport-Zelienople. The Harrisburg terminal handles traffic sent from Baltimore for deliveries and pickups in the following areas: Lock Haven-Williamsport, Harrisburg-Reading, Allentown-Bethlehem-Easton, and Lancaster-York. Freight picked up in these areas is returned to the Harrisburg terminal and sent to Baltimore on a road run, with a further occasional road run to Pittsburgh.

PJAX agreed in the Settlement Stipulation that it lacked authority from the PUC to transport from points in Allegheny County to points on and east of U.S. Highway 15, or vice versa, solely over Pennsylvania highways. R. 692a. U.S. Highway 15 runs generally north to south across the state, following the west bank of the Susquehanna River for much of its length.

PJAX's practice of sending many shipments over interstate routes undeniably resulted in some very circuitous trips. Examples noted by the PUC in its brief include: Pittsburgh to Beaver Falls via Niles, in excess of 100 miles (30 miles direct); Pittsburgh to Butler via Niles, 130 miles (45 miles direct); Pittsburgh to Mt. Pleasant and Connellsville via Morgantown, in excess of 100 miles (30 and 35 miles direct, respectively); Pittsburgh to Monessen via Morgantown, 108 miles (18 miles direct); Pittsburgh to Williamsport via Baltimore, 420 miles (230 miles direct).

Although the Interstate Commerce Commission lacks jurisdiction over intrastate transportation, it does have jurisdiction over transportation of property or passengers by motor carrier between points in the same state "through another state," pursuant to section 10521 of the Revised Interstate Commerce Act, 49 U.S.C. §10521.[2]

When, as in the present case, a state regulatory agency determines that a carrier's claim of interstate authority in regard to specific transportation is an illegit-

---

[2] Section 10521 of the Revised Interstate Commerce Act provides in part as follows:

§10521. General jurisdiction

(a) Subject to this chapter and other law, the Interstate Commerce Commission has jurisdiction over transportation by motor carrier and the procurement of that transportation, except by a freight forwarder (other than a household goods freight forwarder) to the extent that passengers, property, or both, are transported by motor carrier—

(1) between a place in—

(A) a State and a place in another State;

(B) a State and another place in the same State through another State ... .

. . . .

(b) This subtitle does not—

(1) except as provided in sections 10922(c)(2), 10935, and 11501(e) of this title [all relating to regulation of motor common carriers of passengers], affect the power of a State to regulate intrastate transportation provided by a motor carrier;

. . . .

(3) except as provided in section 10922(c)(2) of this title, allow a motor carrier to provide intrastate transportation on the highways of a State ... .

Before the enactment of the Revised Interstate Commerce Act on October 17, 1978, P.L. 95-473, 92 Stat. 1361, essentially the same provisions appeared at 49 U.S.C. §302(a), which vested power over the regulation of interstate commerce in the ICC, and 49 U.S.C. §303(a)(10), which defined "interstate commerce" as meaning "commerce between any place in a State and any place in another State or between places in the same State through another State. ..."

imate subterfuge, and imposes penalties on the carrier based on state law, then the threshold question is whether the state agency had jurisdiction to make such a determination. As PJAX has framed the issue here, "Was it beyond the power of the Pennsylvania Public Utility Commission to rule said operations a subterfuge?"

The United States Supreme Court considered precisely this issue in the case of *Service Storage and Transfer Co., Inc. v. Commonwealth of Virginia*, 359 U.S. 171 (1959). In *Service Storage*, a motor carrier holding a certificate from the ICC, but without any authority from Virginia to conduct intrastate operations, transported some shipments from Virginia points to the carrier's main terminal in West Virginia and then back to Virginia destinations. Going to the main terminal, the freight was mixed with shipments destined to points outside of Virginia, and going from the main terminal into Virginia the freight was combined with shipments from outside Virginia. About 3% of the shipments picked up in Virginia were destined for delivery in Virginia.

The Virginia State Corporation Commission fined the carrier for the shipments with both origins and destinations within the state. Virginia conceded that the shipments in question had actually left the state, but it supported its characterization of them as being really intrastate in nature by noting that if they had moved over direct routes, they would not have left the state. The Virginia commission hence decided that the circuitous routing was a subterfuge to avoid state regulation of essentially intrastate operations.

On the merits of the case, the Supreme Court concluded that the carrier's claim of bona fides was supported by uncontroverted evidence that the operation was efficient and profitable for the carrier, as well as time- and money-saving for the shippers. Further support came from the fact that the ICC previously had expressly

approved the type of operation in question when it approved the acquisition of Service Storage by another carrier. Therefore, the Court concluded that the operation was not a subterfuge.

On the question of jurisdiction, the Court noted that the ICC had jurisdiction over trips between points within a state through another state pursuant to 49 U.S.C. §§302(a) and 303(a)(10), that the carrier's ICC certificate on its face covered the entire operation, that 49 U.S.C. §312 provided that all certificates issued by the ICC should remain in effect until suspended or revoked according to the Act, and that enforcing the fines assessed against the carrier by Virginia would be tantamount to a partial suspension of the carrier's federally granted certificate.

The Court held:

It appears clear that interpretations of federal certificates of this character should be made in the first instance by the authority issuing the certificate and upon whom Congress has placed the responsibility of action. The Commission has long taken this position. Compare Atlantic Freight Lines, Inc. v. Pennsylvania Public Utility Com. 163 Pa. Super 215, 60 A.2d 589 [(1948)], with Atlantic Freight Lines, Inc.—Petition for Declaratory Order, 51 MCC 175 [(1949)].

*Service Storage*, 359 U.S. at 177. The Court noted that Service Storage had petitioned the ICC for a declaratory order after its hearing in the state proceeding but before the state decision was rendered. The ICC ultimately issued an opinion approving the disputed traffic as being authorized under the carrier's interstate certificate. Interpreting the same facts and the same ICC certificate, the state and federal agencies reached opposite results. The Court said, "Such conflicts can best be avoided if the

interpretation of I.C.C. certificates is left to the Interstate Commerce Commission." *Id.* at 178.

Finally, the Court noted that Virginia was not helpless to act if it believed that the carrier's operation was not bona fide interstate commerce but rather a subterfuge to escape state jurisdiction. The state could avail itself of the complaint procedure provided in 49 U.S.C. §304(c)(2). "Thus the possibility of a multitude of interpretations of the same federal certificate by several States will be avoided and a uniform administration of the Act achieved." *Id.* at 179.[3]

PJAX here presented an argument based on *Service Storage* to the commission. The commission acknowledged the holding of *Service Storage,* but quoted speculation from a PUC opinion five years after that decision: "[W]here the claim of ICC authorization is remote and clearly inapplicable, the question would then confront us, whether we have preliminary jurisdiction in that situation." *Erskine & Sons v. Jack L. McFeely, t/d/b/a McFeely Trucking,* 41 Pa. P.U.C. 548, 550 (1964). The commission considered the circuitousness of PJAX's routings

---

[3] Later the same year, in a Pennsylvania case, the U.S. Supreme Court reversed the judgment of our Superior Court which had upheld an assertion of jurisdiction by the Public Utility Commission under similar circumstances in *Jones Motor Co., Inc. v. Pennsylvania Public Utility Commission,* 188 Pa. Superior Ct. 449, 149 A.2d 491 (1958). The Superior Court decision, issued several days before *Service Storage* was handed down, relied primarily on the Superior Court's earlier decision in *Atlantic Freight Lines v. Pennsylvania Public Utility Commission,* 163 Pa. Superior Ct. 215, 60 A.2d 589 (1948), *cert. denied,* 336 U.S. 925 (1949), which had upheld the PUC's jurisdiction. *Atlantic Freight Lines* was expressly mentioned and implicitly disapproved by the Supreme Court in *Service Storage.* The Supreme Court's per curiam order simply reversed the decision, citing *Service Storage. Jones Motor Co., Inc. v. Pennsylvania Public Utility Commission,* 361 U.S. 11, *petitions for reconsideration and clarification denied,* 361 U.S. 904 (1959).

in the light of a 1951 PUC decision setting forth a standard for determining when a claim of ICC authorization was a subterfuge. Because the commission concluded that PJAX's operations involved a subterfuge to avoid PUC regulations, the commission then considered whether the carrier had raised a "colorable claim" of ICC authorization. Not surprisingly, the commission found none, and concluded that it had jurisdiction.[4]

The commission's reasoning on this issue was backwards. No one disputes that PJAX's ICC authority on its face covers the transportation at issue.[5] Once the commission found as a fact that the disputed shipments left the state and came back in, then, in order to determine whether the operation was a subterfuge, the commission had to consider the facts describing the operation *in the light of the carrier's ICC authority*. If the operation were legitimate exercise of the carrier's ICC rights, it could not be a subterfuge. The only way for the PUC to decide that

---

[4] In its later order denying the petitions for reconsideration of both PJAX and the complainants, the PUC repeated this argument in capsule form. There the commission cited *Erskine & Sons*, presumably referring to the speculative comment quoted in the text, *National Retail Transportation, Inc. v. Pennsylvania Public Utility Commission,* 109 Pa. Commonwealth Ct. 72, 530 A.2d 987 (1987), which involved the entirely distinct issue of when shipments that concededly began as interstate commerce ceased to be such, and *Atlantic Freight Lines,* implicitly disapproved in *Service Storage*.

[5] The ICC authority of PJAX authorizes the carrier:

> To operate as a Common Carrier, by Motor Vehicle, in Interstate or Foreign Commerce, over Irregular Routes, transporting General Commodities (except Classes A and B Explosives, Household Goods and Commodities in Bulk), between points in Alabama, Arkansas, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maryland, Mississippi, Michigan, Missouri, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, West Virginia, Wisconsin, and the District of Columbia.

Exhibit R-5; R. 781a.

question was *to interpret* what the ICC certificate did and did not permit.

In its brief the PUC argues that the evidence of subterfuge was so overwhelming that there was no need for the PUC to interpret the carrier's ICC certificate, and that the commission did not do so. That position is negated by the commission's own words:

> We find that the Respondent has failed to establish by a preponderance of the evidence that the shipments in question were conducted under its ICC authority. *We cannot believe that the ICC intended to confer on the Respondent such a broad grant of rights*. We are persuaded from the record that the Respondent was engaged in a subterfuge. Accordingly, we find that the Respondent has not raised a colorable claim of ICC authority and, therefore, this Commission has jurisdiction over the parties hereto and the subject matter of this proceeding. (Emphasis added.)

The PUC argues forcefully in its brief that the present case may be distinguished from *Service Storage* because of the presence of significant evidence of bad faith here, namely, that PJAX agreed in the earlier PUC complaint proceeding that it lacked intrastate authority to serve the points at issue here and did not raise an interstate commerce defense in that proceeding, that PJAX continued to serve points that it had agreed to stop serving under the Settlement Stipulation in the earlier proceeding, and that PJAX raised its interstate commerce defense only after was charged with violating the terms of the Settlement Stipulation. Further, PJAX presented only relatively vague testimonial evidence of a business justification for this method of operation, claiming a need to assure a balance of freight (R. 472a-74a), unsupported by documentary evidence. By contrast, the Supreme Court

had found abundant evidence in *Service Storage* of the carrier's good faith in pursuing its longstanding method of operation, which previously had been expressly approved by the ICC, and which was shown by uncontroverted evidence to be practical, efficient, profitable for the carrier and of unique value to its customers.

The commission's argument fails because it is based upon an erroneous interpretation of the holding of *Service Storage*. Although whether particular service was "legitimate" is a mixed question of fact and law, different emphasis in analysis can lead to different results. By focusing on the word "subterfuge," the PUC has strayed into an analysis based on the primarily *factual* question of the nature of the carrier's motives. However, the holding of *Service Storage*, quoted above, focuses on the primarily *legal* question of what kind of service was authorized by a carrier's ICC certificate. The Court referred several times to the dangers involved in permitting that question to be decided by state commissions as well as by the ICC. Although stronger evidence of bad faith is present here, that evidence does not remove this case from the scope of the holding of *Service Storage*.

The PUC's demand for an assertion of a "colorable claim" of interstate authority in order to oust it of jurisdiction is understandable, but the commission has applied that standard so broadly as to negate the import of *Service Storage*. If a carrier claimed ICC authority for transportation between points in Pennsylvania through Ohio, for example, but then produced an ICC certificate not facially covering such transportation, then the carrier would not have raised a "colorable claim" of ICC authority. Similarly, if a carrier failed to prove, on a claim such as that involved here, that its trucks actually left the state, then no colorable claim would have been made out.

Where, as here, a carrier possesses ICC authority that facially covers challenged transportation, where the

PUC has found as a fact that the shipments actually left the state, and where the carrier has asserted a business justification for its method of operation that conceivably could be upheld, then, under *Service Storage*, the ICC is the agency which must first determine whether that transportation constitutes a legitimate exercise of the carrier's interstate authority, and the PUC lacks jurisdiction to make such a determination. Therefore, the PUC's conclusion that it had jurisdiction to determine whether the shipments through another state were legitimately interstate was unfounded. We must reject the PUC's assertion of jurisdiction and remand this case so that the commission may modify the penalties it has imposed on PJAX, after excluding the shipments described in this section from the total number of violations.

## 2. POOL TRUCK DISTRIBUTION TRAFFIC

PJAX asserts that the ALJ and the commission confused the concepts of pool truck distribution traffic (delivery by local carriers, to the ultimate destination, of different portions of a solid load of freight received from out-of-state, pursuant to a manifest or individual bills designating the final destination and the carrier), validly performed in interstate commerce without the need for PUC approval, with pooling arrangements among intrastate shippers, which do require such approval. This argument relates to traffic that PJAX handled for Colgate-Palmolive Company, Personal Products Company, Olsonite Corporation and Rome Cable Corporation. The PUC all but concedes this point by suggesting that any error the commission committed in this regard was harmless and would not support a reversal of the order and that, in view of the magnitude of PJAX's unlawful operations, a relatively small number of lawful shipments would not have affected the commission's decision.

Because the PUC assessed a fine based principally on a particular number of violations, a change in that number could have affected the amount of the fine, although a small reduction obviously would not have significantly altered the commission's judgment as to the carrier's culpability. In view of the need to remand this case for other reasons, we shall direct the commission to review its analysis relating to this class of shipments, and to modify its fine if any or all of the violations are determined to have resulted from confusion on the commission's part.

### 3. WAREHOUSE SHIPMENTS

The next category of disputed transportation involves some 678 shipments from warehouses in Allegheny County operated by USCO Service, Inc., Fisher Scientific, E.G. Baldwin and Associates and Pennsylvania Floor Coverings, to points in Pennsylvania. In each case a carrier other than PJAX brought the goods to the warehouse from out of state, and the goods were not designated for delivery to any particular customer when they arrived. The goods were stored at the warehouse for undetermined periods of time, until the owner of the goods directed the warehouse to fill orders from storage. PJAX then transported the goods to their ultimate destination in Pennsylvania without crossing state lines.

Again, PJAX claimed as an affirmative defense that these shipments were in interstate commerce and were authorized by its interstate authority and so not subject to PUC jurisdiction. These shipments, admittedly performed by PJAX wholly within Pennsylvania, are not subject to an analysis based on *Service Storage*, where the issue presented was the legitimacy as interstate commerce of transportation between points in a state through another state.

As this court recently noted:

> [W]hether transportation is interstate or intrastate is determined by the essential character of the commerce, manifested by a shipper's fixed and persisting intent at the time of the shipment which is ascertainable from all of the facts and circumstances surrounding the transportation scheme. Southern Pacific Transportation Co. v. Interstate Commerce Commission, 565 F.2d 615 (9th Cir. 1977). The intent of the shipper to be considered is his present as distinguished from his ultimate intent. United States v. Majure, 162 F. Supp. 594 (S.D. Miss. 1957).
>
> . . . Although a shipment does not lose its character as interstate commerce when, for reasons of necessity or convenience, the course of the shipment is interrupted, delivery of a product into a state ceases being in interstate commerce when it has come to rest at a given point. Blackmore v. Public Service Commission, 120 Pa. Super. 437, 183 A. 115 (1935).

*National Retail Transportation, Inc. v. Pennsylvania Public Utility Commission,* 109 Pa. Commonwealth Ct. 72, 82-83, 530 A.2d 987, 992 (1987).

PJAX relies on *H.C. Gabler, Extension, Foodstuffs,* No. MC-27817 (Sub-No. 91), 1970-1972 Fed. Carr. Cas. (CCH) ¶36,620 (March 20, 1972), in which a carrier applied for an enlargement of its ICC authority to enable it to transport foodstuffs, originally brought to two distribution facilities in central Pennsylvania from out-of-state, and then shipped to consignees in Pennsylvania. In concluding that such transportation was interstate, the ICC said:

> As [the protestant] pointed out, the essential character of the commerce, as determined by shipper's intention to ship the product *to a specific ultimate destination beyond the storage point*

*at the time the transportation begins,* is dispositive. ... Factors such as through billing, uninterrupted movement, continuous possession, and unbroken bulk are merely persuasive, not determinative. ... In view of the foregoing evidence, especially the fact that the principal (i.e. the initial shipper-manufacturer) advises [the distribution facility] of the ultimate destination of the goods, we conclude that the traffic is interstate.

*Gabler* at ¶36,620.01 (emphasis added, citations omitted).

The language quoted immediately above is entirely consistent with the discussion of this court in *National Retail Transportation* and supports the PUC's conclusion that the transportation PJAX provided from the four warehouses was intrastate in character. Unlike the transportation proposed in *Gabler,* the shipments at issue here are not designated for a specific ultimate destination beyond the storage point when the transportation begins. Here the fixed intent of the out-of-state shippers of the goods *at the time of shipment* is simply to transport the goods to the warehouses for storage. The ultimate destinations beyond the storage points are not identified until some indefinite later time when customers of the owners of the goods place orders for them. The goods "come to rest" at the warehouses, and PJAX's later transportation of them to various Pennsylvania destinations is intrastate commerce. Therefore, we shall affirm the commission's decision to the extent that it held that the warehouse shipments were not authorized.

### 4. INTRASTATE SHIPMENTS

The final category of disputed shipments are those to a variety of locations that are conceded by PJAX to have been conducted in intrastate commerce, but for which

PJAX claims PUC-granted authority despite the Settlement Stipulation.

Our scope of review of a PUC order interpreting rights that the PUC itself has granted is somewhat more restricted than the general scope of review noted above:

'The [Public Utility] Commission, as an administrative agency, is peculiarly fitted to interpret its own orders, especially where the question raised concerns the extent and limit of transportation rights granted a carrier under a certificate issued by the Commission. In recognition of this principle a court will not set aside a construction placed upon its own orders by an administrative agency unless the result is clearly erroneous, arbitrary, and unsupported by evidence.'

*Delaware Valley Transportation Co. v. Pennsylvania Public Utility Commission*, 42 Pa. Commonwealth Ct. 221, 223, 400 A.2d 678, 679 (1979) (quoting *W.J. Dillner Transfer Co. v. Public Utility Commission*, 175 Pa. Superior Ct. 461, 467, 107 A.2d 159, 162 (1954), *appeal dismissed*, 349 U.S. 903 (1955)).

First, PJAX asserts that the PUC erred in that "even traffic which clearly comes within the purview of PJAX's intrastate authority have [sic] been counted as illegal. Among these were such points as Punxsutawney, Clearfield, DuBois, Philipsburg, Hollidaysburg, Altoona and Lewistown (Exhibits R-1, R-2, R-4; R-749a, 758a, 763a, 779a)." However, as the PUC notes in its brief, in addition to failing to refer to the portion of the commission's order or the underlying initial decision that found transportation to these points to be unlawful, PJAX failed to raise this issue before the commission, which precludes its consideration on appeal. *Metro Transportation Co. v. Pennsylvania Public Utility Commission*, 105 Pa. Commonwealth Ct. 592, 525 A.2d 24 (1987); 2 Pa. C. S. §703(a).

Next, PJAX claims that the PUC erred by holding that Greensburg was beyond the scope of its intrastate authority, despite the carrier's evidence in the form of tariffs of its predecessor which it claimed to have discovered in an attic after the signing of the Settlement Stipulation, and despite testimony of PJAX's witness that he personally handled shipments to Greensburg, at least until 1963, when he worked for the predecessor. The PUC relied on the Settlement Stipulation executed by PJAX in December of 1986 as a comprehensive description of areas that PJAX could and could not serve under its existing PUC authority. In that Settlement Stipulation PJAX expressly agreed that it could not serve Greensburg, except for the extreme northwestern tip, which falls within the carrier's authority to serve points within a twenty-five mile airline distance from the City-County Building in Pittsburgh.

This matter obviously involves interpretation by the PUC of rights that it has granted. In view of the fact that PJAX went ahead and performed this service, after expressly agreeing that it lacked authority to do so, in reliance on old certificates and personal experience of questionable applicability, rather than seeking a change in the Settlement Stipulation, the commission's interpretation of its grants of authority to PJAX as not including Greensburg was not clearly erroneous or arbitrary.

Lastly, PJAX continues its objection to the commission's conclusion that PJAX may not serve Clarion under its authority by combining Paragraphs 9, 11 and 13 of its rights granted by the commission pursuant to an order entered December 16, 1985. Exhibit R-2; R. 755a-67a. The commission considered this argument in detail in its decision ruling on the exceptions filed by the parties to the initial decision of the ALJ. The commission reproduced verbatim the paragraphs relied upon by PJAX and

then explained why the interpretation asserted was not consistent with PUC regulations or precedent. Once again, the PUC's interpretation was not clearly erroneous or arbitrary, and so that interpretation must be upheld.

As a final note, we observe that PJAX has not appealed from the commission's assessment of a penalty against it for various discovery violations. The PUC's order obviously must be affirmed on that point.

### ORDER

NOW, January 31, 1989, the orders of the Pennsylvania Public Utility Commission at Docket No. A-102956C871, entered July 28, 1988, and August 23, 1988, are reversed to the extent that they held that the Public Utility Commission had jurisdiction over service performed by Pittsburgh-Johnstown-Altoona Express between points in Pennsylvania through another state. The case is remanded for the Public Utility Commission to modify its fine assessed against the carrier, excluding violations based on such service.

In addition the commission is directed to reconsider that portion of its decision relating to shipments handled by PJAX for Colgate-Palmolive Company, Personal Products Company, Olsonite Corporation and Rome Cable Corporation and to modify the fine assessed against PJAX if the commission concludes that its previous orders relating to those shipments were based on confusion.

In all other respects the orders of the Public Utility Commission are affirmed.