**PROGRESSIVE CASUALTY INSURANCE COMPANY, Appellant,**

v.

**Blanche M. HOOVER and James E. Hoover, Her Husband, Loren J. Druist, Wayne S. Hursh, Marbec Trucking Company, Marvin Sensenig t/d/b/a Marbec Trucking Company, and K.B.S., Inc., Appellees.**

Superior Court of Pennsylvania.

Argued June 27, 2000.

Filed Feb. 14, 2001.

Ira Lipsius, John Burns and William R. Tighe, Pittsburgh, for appellant.

Francis C. Rapp, Pittsburgh, for Hoover, for appellee.

Richard L. Bushman, Spring Run, for Sensenig, appellee.

Before JOYCE, ORIE MELVIN and MONTEMURO *, JJ.

ORIE MELVIN, J.:

¶ 1 Progressive Casualty Insurance Company (Progressive) appeals from the November 12, 1999 Order granting summary declaratory judgment to Blanche and James Hoover (Hoovers) finding Progressive is obligated to pay any final judgment up to a million dollars recovered by the Hoovers in their personal injury suit against Progressive's insured, Marbec Trucking Company (Marbec). For the reasons that follow, we affirm.

¶ 2 The Hoovers initiated a civil action in Allegheny County Court of Common Pleas seeking damages for serious personal injuries sustained by Mrs. Hoover on November 15, 1995 after the Hoover vehicle was struck by a tractor trailer which was driven by Loren J. Druist. At the time of this collision, the tractor-trailer was owned by Wayne S. Hursh and leased to Marbec.[1] It is undisputed at the time of the accident Marbec was a certified motor carrier operating under a valid Interstate Commerce Commission (ICC) certificate. Pursuant to federal requirements, Marbec purchased sufficient commercial insurance from Progressive to obtain a certificate to permit it to operate in interstate commerce. 49 U.S.C.A. § 10927(a)(4). Mar-

bec's policy from Progressive included an MCS–90 Endorsement. The trial court noted the MCS–90 Endorsement provided that, in consideration for the premium, Progressive "would pay any final judgment rendered against the insured for public liability resulting from the negligence in the operation, maintenance or use of motor vehicles...Regardless of whether the particular motor vehicle is specifically described in the policy or whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere." Trial Court Opinion, 2/16/00, at 2. (citing Insurance Policy attached to Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment).

¶ 3 Once the Hoovers filed their personal injury suit, Progressive filed a Complaint for Declaratory Judgment seeking a determination of its liability under the policy it issued Marbec. In effect, Progressive sought to avoid coverage arguing the MCS–90 Endorsement was inapplicable and they were not obligated to indemnify any of the Defendants in the personal injury action for two reasons. First, Progressive argued to the trial court, since neither the Hursh tractor-trailer nor its driver [Loren Druist] were ever added to the Marbec policy, they were not insured under it. In addition, and key to the issue before us now, Progressive asserted since the transportation involved in the civil action was wholly intrastate, and not interstate, the MCS–90 endorsement was inapplicable. Progressive's Motion for Summary Judgment was denied on June 15, 1999.

¶ 4 The Hoovers then filed a Motion for Summary Judgment. On November 12, 1999, the trial court found Marbec was involved in interstate commerce at the time of the accident and the provisions of the MCS–90 endorsement applied. Accordingly it granted the Hoovers' Motion for Summary Declaratory Judgment

---

* Retired Justice assigned to the Superior Court.

1. Defendant K.B.S., Inc. was dismissed from the case per stipulation filed April 9, 1999.

against Progressive and determined that pursuant to that endorsement, Progressive was obligated to pay any final judgment recovered by the Hoovers in their civil action up to the policy limit of $1,000,000.00. *Id.* at 6. This appeal followed.

■ ¶ 5 Appellants frame their sole issue on appeal as follows:

Whether the vehicle operated by Marbec transporting a load of grain from a warehouse facility at West Elizabeth, Pennsylvania, exclusively on Pennsylvania roads to a destination at Mt. Loysville, Pennsylvania, was being used in interstate commerce at the time of the accident so as to make the MCS–90 endorsement attached to the Progressive policy applicable.

Appellant's Brief at 4.

¶ 6 We begin our analysis by setting forth the standard we follow when asked to determine the propriety of a grant of summary judgment:

Our standard of review in cases of summary judgment is well settled. This court will only reverse the trial court's entry of summary judgment where there was an abuse of discretion or an error of law. Summary judgment is proper when the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits demonstrate that there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. In determining whether to grant summary judgment a trial court must resolve all doubts against the moving party and examine the record in the light most favorable to the non-moving party. Summary judgment may only be granted in cases where it is clear and free from doubt the moving party is entitled to judgment as a matter of law.

*Jones v. Snyder,* 714 A.2d 453, 455 (Pa.Super.1998) (citations omitted). Neither party disputes the facts. Instead, the question before the trial court was essentially whether, as a matter of law, Marbec was engaged in interstate or intrastate commerce at the time of the accident. If they were involved in interstate commerce at the time of the accident, the MCS–90 endorsement applies regardless of whether the Hursh tractor-trailer or its driver were specifically added to the Marbec policy. Therefore, we will only reverse if the trial court abused its discretion or erred as a matter of law.

¶ 7 The undisputed facts as summarized by the trial court are as follows:

The record in this case reveals that on or about October 11, 1995, the Jesse Stewart Co., a grain wholesaler that sells primarily to feed mills in Pennsylvania, received an order for 345 tons of distillers grain from the Pennsylvania Agricultural Commodities Marketing Association, Inc. (PACMA). Distillers grain is a by-product of a distilling process that produces ethanol. This grain is mixed with other additives to make dairy feed.

At the time of this transaction, PACMA had been a customer of Jesse Stewart from the Archer Daniels Midland Distillery (ADM) in Peoria, Illinois. In fact, PACMA specifically ordered this grain because it was manufactured by ADM.

Jesse Stewart normally places orders for distillers grain from ADM after it has received orders from its customers. Once it receives sufficient orders to justify purchasing a barge, which contains from 1,000 to 1,500 tons, Jesse Stewart arranges, as it did in this case, for the transportation of this grain by barge from the ADM distillery in Illinois to a storage facility owned and operated by Clairton Slag and pays Clairton Slag to unload the grain from the barges and store it in the storage shed. The grain remains in this storage shed until Jesse Stewart's customer, PACMA in this case, picks it up or sends a truck to transport it.

On November 15, 1995, a truck dispatched by Marbec and driven by Druist, arrived at the Clairton Slag storage facility and was loaded with approximately 23 tons of this distillers grain. The destination of this load was one of PACMA's customers, Kreiders Feed Mill, which is located in Loysville, Pennsylvania. After this grain was loaded, the truck began its journey and was en route to Loysville when it collided with the Hoover vehicle.

Trial Court Opinion, 2/16/00, at 2–4.

¶ 8 As noted above, key to the disposition of this case is the determination of whether Marbec was engaged in interstate or intrastate commerce at the time of the accident. The appellant basically argues there are two shipments involved here; one from Illinois to West Elizabeth and the other from West Elizabeth to Loysville. They concede the first shipment is interstate, but they insist the second is intrastate. In support of their position they point out that the first shipment from Illinois to Pennsylvania, was handled by Jesse Stewart Co., a different shipper than the company that handled the second shipment. While they acknowledge the grain moved first by barge, they also claim the grain came to rest in West Elizabeth at the end of the first trip. We must reject appellant's contentions.

¶ 9 The question of whether certain commerce is interstate or intrastate has not arisen in Pennsylvania in this very same context; however, there are Pennsylvania cases that provide some guidance. In *National Retail Transportation, Inc. v. Pennsylvania Public Utility Commission,* 109 Pa.Cmwlth. 72, 530 A.2d 987 (1987), our Commonwealth Court was asked to review a PUC order sustaining a complaint filed against the carrier by a competitor and denying the carrier's application for operating rights in additional areas. Critical to the disposition of the case was whether NRT's transportation of goods was "intrastate" transportation subject to the PUC's jurisdiction. The Commonwealth Court concluded that it was.

¶ 10 In that case, the transportation scheme in question involved rolls of material taken by motor carriers from textile mills or distributors in New Jersey, New York, North Carolina and South Carolina to garment factories in Pennsylvania for manufacturing into finished garments. During the process, at various stages, the materials were shipped to different factories within the state. It was this transportation, between different factories in Pennsylvania, that the court was asked to examine. The Court recognized the facts presented in that case included that "[o]ften the original out-of-state shipper (manufacturer) does not know the ultimate retail customer for the finished garment when the rolls of material are shipped into Pennsylvania. However, the manufacturer's primary intent is for the finished garments to be shipped out of Pennsylvania upon completion of the manufacturing process." *Id.* at 990–91. There, NRT argued the service provided was interstate because it was intended by the shipper to originate and terminate at points beyond Pennsylvania as part of an overall continuous movement in interstate commerce. The PUC argued the flow of interstate commerce was interrupted by the manufacturing processes, which materially changed the character, utility and value of the transported goods and changed the interstate commerce to intrastate commerce. In making its determination the Commonwealth Court first set forth the test to be applied as follows:

> Whether transportation is interstate or intrastate is determined by the essential character of the commerce, manifested by a shipper's fixed and persisting intent at the time of the shipment which is ascertainable from all of the facts and circumstances surrounding the transportation scheme. *Southern Pacific Transportation Co. v. Interstate Commerce Commission,* 565 F.2d 615 (9th Cir.1977). The intent of the shipper to

be considered is his present as distinguished from his ultimate intent. *United States v. Majure,* 162 F.Supp. 594 (S.D.Miss.1957).

*Id.* at 992.

¶ 11 While the Commonwealth Court recognized a shipment does not lose its character as interstate commerce when for reasons of necessity or convenience the course of the shipment is interrupted, it also found the delivery of a product into a state ceases being in interstate commerce when it has to come to rest at a given point. In *National Retail,* our Commonwealth Court found the manufacturer transported his goods through interstate commerce into Pennsylvania with the ultimate intent to move the goods to other states. However, it also found once the goods arrived in Pennsylvania, the present intent of the manufacturer was that the material not leave Pennsylvania until they were processed from rolls of material into finished garments. Accordingly, our Commonwealth Court concluded the manufacturing process employed under the direction of the shipper evidenced the fact that the rolls of material came to rest in Pennsylvania thereby destroying the continuity required to sustain a finding of interstate commerce. The later transportation of the materials during the manufacturing process was no longer interstate, but instead intrastate, and accordingly subject to the PUC's jurisdiction.

¶ 12 *National Retail* provides guidance in so far as we find the transportation of the dark distillers' grain in question here was in the flow of interstate commerce when it entered Pennsylvania. Appellant does not disagree. Instead appellant suggests the shipment was interrupted when it came to rest in Clairton Slag's storage shed. Under the circumstances of this case, we do not reach such a conclusion. It is at this point the facts in the present case are distinguished from the facts in *National Retail.* In the present case, the grain was not subject to any manufacturing process. Nor did it come to rest for

storage at Clairton Slag for any other reason than the fact that it was to be available to PACMA to be shipped directly from that point in the journey from Peoria to the PACMA's previously identified customers who had specifically placed their orders with PACMA for this particular grain because it was manufactured by ADM. Unlike the rolls of fabric in *National Retail,* nothing happened to the grain at Clairton Slag in the way of manufacturing or processing to change it, so as to change the nature of the transportation from interstate to intrastate.

¶ 13 In a later case, *Pittsburgh–Johnstown–Altoona Express, Inc. v. Pennsylvania Public Utility Commission,* 123 Pa.Cmwlth. 237, 554 A.2d 137 (1989), the Commonwealth Court was again asked to determine whether certain shipments between points in Pennsylvania were intrastate or whether they were interstate because the commerce came to the warehouse from out-of-state. In these instances a carrier other than PJAX brought the goods to the warehouse from out-of-state; and the goods were not designated for delivery to any particular customer when they arrived, but instead they were stored at a warehouse for undetermined periods of time until the owner of the goods directed the warehouse to fill orders from storage. PJAX then carried the goods solely within Pennsylvania. In concluding this was intrastate commerce, our Commonwealth Court cited the test set forth in *National Retail, supra.* They reasoned the shipments at issue were not designated for a specific ultimate destination beyond the storage point when the transportation began. They found the fixed intent of the out-of-state shippers of the goods at the time of the shipment was simply to transport the goods to the warehouse for storage. The ultimate destination beyond that was not identified until some indefinite later time when consumers placed orders for them. Accordingly, the goods came to rest at the

warehouse, and any subsequent movement is no longer in the flow of interstate commerce. Since it is intrastate, the PUC had jurisdiction.

¶ 14 While we do not come to the same conclusion in the present case, the rational in *Pittsburgh–Johnstown–Altoona Express* again provides guidance as to what test we should apply when considering whether a shipment is interstate verses intrastate. In the present case, the fixed intent of Jesse Stewart, the out-of-state shipper of the goods at the time of the first leg of the journey, was not simply to transport the goods to Clairton Slag's warehouse for storage. It was to transport the goods as far into Pennsylvania as barge transportation would allow. The ultimate destination of delivery to PACMA customers beyond that was identified well before it arrived in West Elizabeth, PA, when consumers like Kreider Feed Mills placed their orders. The original shipper, Jesse Stewart would not place orders for distillers grain from ADM otherwise, until after PACMA received orders sufficient to justify Jesse Stewart's purchasing a barge. Accordingly, we reject Appellant's argument that the goods came to rest at the warehouse and any subsequent movement is no longer in the flow of interstate commerce.

¶ 15 Appellant argues the trial court erroneously identified the shipper and criticizes the trial court for relying on cases such as *Roberts v. Levine*, 921 F.2d 804 (8th Cir.1990) and *Central Freight Lines v. I.C.C.*, 899 F.2d 413 (5th Cir.1990), where it points out only one shipper is involved. Their criticism is unfounded. Initially, we note the court in *Roberts v. Levine, supra.,* provides us with the same widely accepted general statement of the law in determining whether commerce is interstate verses intrastate:

It is well settled that the determination of whether transportation between two points in [a] State is interstate (or foreign) or intrastate in nature depends on the "essential character" of the shipment... Crucial to this determination is

the shipper's fixed and persisting intent at the time of the shipment...Intent is ascertained from all the facts and circumstances surrounding the transportation.

921 F.2d at 812 (Citations omitted.) This is the same language used by our Pennsylvania Commonwealth Court in *National Retail, supra.* and *Pittsburgh–Johnstown–Altoona Express, supra.*

¶ 16 Moreover, we find the trial court properly focused on the relevant shipper when it looked to the intent of Jesse Stewart at the beginning of the interstate transportation. *Middlewest Motor Freight Bureau v. ICC,* 867 F.2d 458 (8th Cir.1989), addresses whether the second leg of transportation, which is wholly within one state, remains "interstate" in character because the first leg of the journey crossed state lines. There, Matlack, a motor carrier, filed for a declaratory order with the ICC to determine whether certain shipments of bulk chemicals within the State of Missouri were subject to ICC jurisdiction as interstate commerce. The ICC determined they were part of continuous interstate transportation, and the United States Court of Appeals for the Eighth Circuit affirmed. The facts as presented in *Middlewest Motor Freight Bureau, supra.,* were that Chemtech Industries, Inc. (Chemtech) maintained facilities in at least three cities in Missouri–Kansas City, St. Louis and Springfield. In the course of its business, Chemtech routinely received products from out-of-state origins and at its Missouri facilities converted large inbound quantities into smaller outbound quantities. *Id.* at 459. Shipments were made to customers throughout Missouri, and seventy to eighty percent of the bulk product received was subject to supply contracts consummated in advance of the product shipment to Missouri facilities. *Id.* Missouri officials argued the shipments were intrastate and thus subject to state regulation. In its opinion, the Eight Circuit Court of Appeals framed the issue as "whether the transportation from the dis-

tribution point in Missouri to customers in Missouri is part of a continuous interstate operation originating outside of Missouri and is thus covered by the ICC certificate, or whether the second leg of transportation is separate and wholly intrastate." *Id.* at 460. The court recognized the determination of whether transportation between two points within a state is part of a larger interstate transportation service depends on the essential character of the shipment. *Id.* (citing *Texas & N.O.R.R. v. Sabine Tram Co.*, 227 U.S. 111, 122, 33 S.Ct. 229, 57 L.Ed. 442 (1913)). A crucial factor in determining the character of a particular shipment is the "original and persisting intention of the shippers." *Id.* (citing *Baltimore & O.S.W.R.R. v. Settle,* 260 U.S. 166, 43 S.Ct. 28, 67 L.Ed. 189 (1922)). The time when a shipment of goods can be ascribed to interstate commerce is when shipment begins its transportation from destination in another state. *Id.* (citing *Texas & N.O.R.R. v. Sabine Tram Co.*, 227 U.S. at 123, 33 S.Ct. 229). In affirming the ICC, the court relied on the ICC's findings that the vast majority of the shipments involved supply contracts and other sales arrangements entered into prior to shipment, and Chemtech knew in almost all cases the final destination from the moment the shipment originated out-of-state. In addition, no manufacturing or processing took place in St. Louis at the beginning of the second leg. Instead, the inbound goods were simply converted into smaller outbound volumes according to customer need. *Middlewest Motor Freight Bureau,* at 460–61.

¶ 17 Interestingly, the court in *Middlewest Motor Freight Bureau* addressed the argument that the facts there were analogous to *Atlantic Coast Line R.R. v. Standard Oil Co.*, 275 U.S. 257, 48 S.Ct. 107, 72 L.Ed. 270 (1927), much like the appellant in the present case argues. The court in *Middlewest Motor Freight Bureau* distinguished *Atlantic Coast Line R.R. v. Stan-*

*dard Oil Co.* by recognizing in *Atlantic* the Court found no intent at the time of the initial movement that the product be shipped beyond the storage facilities. Likewise, we agree that since Jesse Stewart intended that the dark distillers grain continue movement through West Elizabeth, PA for delivery to PACMA's known customers, who placed specific orders prior to shipment from Peoria, the essential character of the shipment was interstate during the first leg of the journey and it continued to be interstate between the points in Pennsylvania before it reached those customers like Kreider's Mills.

¶ 18 Furthermore, we are not persuaded by appellant's distinction that the trial court relied on cases where only one shipper is involved. In *Middlewest Motor Freight Bureau,* the court does not even mention whether one shipper handled all of the transportation or not, but instead focused on the character of the shipment. From a reading of the underlying ICC decision, it is clear the first leg of the journey from out-of-state to Chemtech occurs by barge, rail and motor carrier. *Matlack, Inc.,* No. MC–C–10999 (ICC June 1, 1987).[2] This suggests assorted different shippers were involved in the *Middlewest Motor Freight Bureau* case.

¶ 19 Appellant's reliance on *Lebanon Coach v. Carolina Casualty,* 450 Pa.Super. 1, 675 A.2d 279 (1996) begs the question of whether the shipment here was intrastate or interstate. We agree with appellant that the court in *Lebanon Coach* held the MCS–90 endorsement does not apply to an accident that occurred in the course of transportation wholly within the Commonwealth of Pennsylvania. We also agree the fact that goods are transported by an I.C.C. certified carrier does not somehow transform transportation within a single state into an interstate movement. However, in the present case, there is the

---

**2.** Middlewest Motor Freight Bureau and others instituted a petition for review seeking reversal of the ICC's declaratory order issued

in *Matlack, Inc.,* No. MC–C–10999 (ICC June 1, 1987) thus explaining the change in name of the case.

critical question of whether interstate commerce of goods was involved. The MCS–90 endorsement applies here because the nature of the shipment was interstate.

¶ 20 Finally, appellant has presented this court with a copy of an ICC opinion in the matter of *Hays Home Delivery Services, Inc*, at No. MC–C–30219 (ICC 1994) as dispositive of the present issue. Appellant apparently relied on it for the proposition that when the initial shipper is different from the second shipper, there can be no fixed and persisting intent, for there is no one shipper in a position to manifest that intent with respect to both legs of the shipment. However, we find this ICC holding to be in conflict with *Middlewest Motor Freight Bureau, supra.*, discussed in detail above. We are convinced the focus must remain on the essential character of the goods being transported and the "original and persisting intention of the shippers" when the goods first enter the stream of the interstate commerce. Because the nature of the goods in the present case were not altered in any way (either through manufacturing or processing) and because they did not "come to rest" in West Elizabeth, PA for storage or resale to potential customers undetermined prior to their arrival, we must agree with the trial court that this grain continued in the flow of interstate commerce when the accident with the Hoovers occurred. To find otherwise would be to permit buyers and sellers to change the nature of interstate commerce by merely changing shippers in midstream.

¶ 21 Order affirmed.