LINCOLN GENERAL INSURANCE
COMPANY, Appellant,

v.

LIBERTY MUTUAL INSURANCE
COMPANY, Carl Wasson Trucking,
Craig Fenner, Fenner Trucking, Inc.,
John Belusik and Marianne Belusik.

Superior Court of Pennsylvania.

Submitted April 15, 2002.
Filed June 25, 2002.
Reargument Denied Aug. 26, 2002.

Jonathan H. Rudd, Harrisburg, for appellant.

David A. Schwartz, Philadelphia, for Belusik, appellees.

Robert A. Lerman and Wayne E. Bradburn, York, for Fenner and Liberty Mutual, appellees.

Charles A. Schneider, State College, for Carl Wasson, appellee.

Before ORIE MELVIN, KLEIN and KELLY, JJ.

KLEIN, J.

¶ 1 Lincoln General Insurance Company appeals from the Order of October 22, 2001 in this declaratory judgment action granting Summary Judgment in favor of Liberty Mutual Insurance Company, Craig Fenner, and Fenner Trucking and denying Summary Judgment in favor of Lincoln General. We affirm.

¶ 2 As this is somewhat of a long, strange trip, an introduction of the parties is in order. Liberty Mutual (Liberty) insures Craig Fenner and Fenner Trucking (Fenner). Fenner is an authorized carrier, holding federal and local authorization to conduct certain trucking operations, in this case, hauling steel rolls. Carl Wasson and Wasson Trucking (Wasson) are a licensed truck driver. Wasson Trucking is the business identity of Carl Wasson, the individual. Wasson is the owner/operator of a truck. Wasson leases the truck to Fenner on a regular basis. In fact, the vast majority, if not all, of Wasson's driving is done for Fenner.

¶ 3 On September 4, 1997, Carl Wasson, who was driving a tractor-trailer, was involved in a motor vehicle accident with John Belusik. Belusik later filed a personal injury action against Wasson, Wasson Trucking, Craig Fenner and Fenner Trucking. As noted above, Fenner and Fenner Trucking are an authorized carrier which leased the Wasson vehicle. A property damage lawsuit, which appears to be a subrogation action, seeking payment for the damages suffered to the Belusik car, was also filed against Wasson. Wasson tendered the claims to both Lincoln General, Wasson's insurer, and Liberty Mutual, Fenner's insurer. Liberty Mutual issued a denial of coverage based upon the lease between Fenner and Wasson and the language of its insurance policy. As a result of that denial of coverage for the personal injury and property damage lawsuits, Lincoln General filed a Declaratory Judgment action which is now the subject of this appeal. Although a variety of subplots present themselves in this case, the main thrust may be summarized: if Wasson was operating the tractor/trailer under contract to Fenner at the time of the accident, then the Liberty Mutual policy must provide the defense and possible indemnity, if not, then the Lincoln General policy applies.

¶ 4 Before we can address the substantive issues presented, a brief history is required.

¶ 5 The relationship between Wasson and Fenner is at the heart of the issue. Wasson is the owner/operator of tractor-trailer. Fenner is an authorized carrier.[1] Wasson leases his rig to Fenner on a regular basis, picking up and delivering loads on behalf of Fenner.[2] Lincoln General provided what is known in the business as deadhead/bobtail insurance to Wasson. Liberty Mutual provided trucking/business insurance to Fenner.

¶ 6 Deadheading and bobtailing are terms used in the trucking industry to denote traveling with an empty trailer and operating the tractor without the trailer, respectively. Often, as is the case here, the owner/operator purchases his/her own deadhead/bobtail insurance, while the authorized carrier provides insurance for the driver while acting under the carrier's authority.

¶ 7 At the time of the accident in question, Wasson was en route to Fairless Hills, Pa. to pick up a load of steel for transportation to the Mann Edge Tool Company of Lewistown, Pa. Wasson was traveling with an empty trailer at the time, in anticipation of receipt of the load of steel. Wasson was, in the parlance, deadheading.

¶ 8 The lease between Fenner and Wasson states the lease begins when Wasson receives the material being shipped and terminates upon delivery. Specifically:

1. Goods may only be transported over the highways with authorization from either the federal or state government, depending upon whether inter- or intrastate transportation is implicated. An authorized carrier is simply, somewhat self-defining, a carrier with the proper authorization.

Lessor (Carl G. Wasson) hereby leases to Lessee (Fenner Trucking, Inc.), and Lessee hereby leases from Lessor, the following described motor vehicle equipment...for the terms of this lease, beginning when the load has been placed on the said equipment, and the bill of lading has been signed by the driver, up to and including when the load is delivered, and the consignee has signed the delivery receipt and/or bill of lading.

¶ 9 The Lincoln General (Wasson) policy contains an exclusion from coverage when the vehicle is being operated for business purposes and/or on behalf of another. It states in relevant part:

EXCLUSIONS

This insurance does not apply to any of the following:

1. BUSINESS USE

a. "Bodily injury" or "property damage" while a covered "auto" is being operated, maintained or used for or on behalf of any other person or organization.

b. "Bodily injury" or "property damage" while you are acting as an agent or employee of any other person or organization. This includes while en route to or from the pickup point or place of destination.

The Liberty Mutual policy provides coverage for vehicles being operated by or on behalf of Fenner only when such vehicles are under lease. This policy defines an "insured" as:

2. Generally, it is the authorized carrier that has either I.C.C. (Interstate Commerce Commission) or P.U.C. (Public Utility Commission) authority to transport material. An owner/operator, who does not have proper authority him/herself, then leases the rig to the authorized carrier and carries freight under the authority of the authorized carrier.

...anyone else while using with your permission a covered auto you own, hire or borrow.

¶ 10 Complicating this matter is a question of whether federal (I.C.C.) [3] regulations or local (P.U.C.) [4] regulations govern the instant matter.

¶ 11 The declaratory judgment action sought a legal determination of which policy was required to provide a defense and possible indemnity on behalf of Wasson— the Lincoln General deadhead policy or the Liberty Mutual trucking policy.

¶ 12 The trial court below found the language of the lease to be clear and that Wasson was not operating his vehicle on behalf of Fenner at the time of the accident. Therefore, the Liberty Mutual policy was inapplicable. Similarly, as Wasson was not under contract to Fenner at the time of the accident and was deadheading, the Lincoln General exclusion was not implicated and the deadhead policy was responsible for providing Wasson with a defense and indemnity.

¶ 13 Lincoln now claims the trial court erred when it failed to consider that the lease between Fenner and Wasson was illegal under the I.C.C. regulations and federal case law which require an authorized carrier to provide liability insurance from time of dispatch. Lincoln claims further error in the trial court finding that Wasson was not acting on behalf of Fenner at the time of the accident. Finally, Lincoln claims the trial court erred in ignoring the "nature of the claims" presented in the underlying complaints, which, it asserts, require Liberty Mutual to assume Wasson's defense.

¶ 14 For the purposes of this appeal only, we will accept as valid Lincoln's contention that the trip lease between Wasson and Fenner was not allowable under I.C.C. regulations. We will further accept as valid that the result of this improper lease arrangement requires the authorized carrier to provide insurance to the contract driver from the time of dispatch.[5] The question still remains, do the federal (I.C.C.) or state (P.U.C.) regulations apply to this particular situation?

¶ 15 Lincoln provides only the bald statement that federal regulations apply. In response, Liberty simply calls this a purely intrastate affair. A careful review of the record indicates which regulations apply.

¶ 16 It is undisputed that if this transaction implicates interstate commerce then the federal government has regulatory authority. *See* 49 C.F.R. §§ 376, 387. Likewise, if only intrastate commerce is involved, Pennsylvania regulations apply. This point is important because Lincoln bases its argument wholly upon the application of federal law. While federal law seemingly requires the authorized carrier to provide liability insurance from the point of dispatch, *see Ropos v. Long Transportation Company*, 147 F.Supp. 698 (W.D.Pa.1957) and *Wilkerson v. Allied Van Lines, Inc.*, 360 Pa.Super. 523, 521 A.2d 25 (1987), Pennsylvania regulations do not.

---

**3.** We are aware that the I.C.C. (Interstate Commerce Commission) no longer exists. It was replaced by the Surface Transportation Board of the Department of Transportation in 1995. However, the regulations are still commonly referred to as the I.C.C. reg(ulation)s. We will, therefore, refer to the federal regulations as such.

**4.** Public Utility Commission. The Pennsylvania authority over intrastate trucking.

**5.** Liberty does not disagree with this contention, so for the purposes of this opinion we will assume the truth of the statement. Ultimately, however, the issue is irrelevant.

■ ¶ 17 At the time of the accident, Wasson was on his way to Fairless Hills, Pa. with the intent to pick up a load of steel for transport to Lewistown, Pa. The fact that the intended trip was wholly with the boundaries of the Commonwealth of Pennsylvania is not dispositive of the issue. What is being transported and for what purpose is also to be taken into consideration.

> Whether transportation is interstate or intrastate is determined by the **essential character of the commerce**, manifested by a shipper's fixed and persisting intent at the time of the shipment which is ascertainable from all of the facts and circumstances surrounding the transportation scheme. The intent of the shipper to be considered is his present as distinguished from his ultimate intent (citations omitted) (emphasis added)

*National Retail Transportation, Inc. v. Pennsylvania Public Utility Commission*, 109 Pa.Cmwlth. 72, 530 A.2d 987, 992 (1987).

¶ 18 The official record indicates Wasson was picking up a load of steel for transport to the Mann Edge Tool Company. Once Mann Edge took possession of the steel, it would be transformed into various tools, such as hammers. The tools would then be sold throughout the country. The present intent of this shipment, therefore, was to transform the steel via the manufacturing process into tools.

¶ 19 Our court, in *Progressive Casualty Insurance Company v. Hoover*, 768 A.2d 1157 (Pa.Super.2001) commented on the difference between inter- and intrastate commerce and the application of trucker's insurance thereto. There, insurance coverage was similarly at issue where a trucker was transporting grain between points in Pennsylvania. The grain had originally arrived in Pennsylvania, via a different shipper, from out-of-state. Progressive argued its insurance did not apply as its endorsement was for interstate commerce and the trip in question was intrastate. Our court disagreed finding the material shipped, grain, had never "come to rest" in Pennsylvania, in spite of it having been stored in a silo prior to the transportation in question. If the material shipped "comes to rest" then the chain of interstate commerce is broken. *Id.* at 1161. A major salient fact involved was that the grain had undergone no change in character while being stored, therefore, the chain of interstate commerce had not been broken. Our court commented:

> [T]he delivery of a product into a state ceases being in interstate commerce when it has come to rest at a given point. In *National Retail*, our Commonwealth Court found the manufacturer transported his goods through interstate commerce into Pennsylvania with the ultimate intent to move the goods to other states. However, it also found once the goods arrived in Pennsylvania, the present intent of the manufacturer was that the material not leave Pennsylvania until they were processed from rolls of material into finished garments. Accordingly, our Commonwealth Court concluded the manufacturing process employed under the direction of the shipper evidenced the fact that the rolls of material came to rest in Pennsylvania thereby destroying the continuity required to sustain a finding of interstate commerce.

*Id.* at 1161.

■ ¶ 20 Here, the facts indicate the material "came to rest." While the steel being transported would undoubtedly and ultimately wind up throughout the United States, the Mann Edge Tool Company was going to use the steel in a manufacturing process, thereby bringing the steel "to

rest" and breaking the chain of interstate commerce. *Id.* As the trip in question was wholly within the borders of Pennsylvania and was not part of the flow of interstate goods, no interstate commerce is implicated and therefore the I.C.C. rules do not apply.

■ ¶ 21 As the I.C.C. rules do not apply, Lincoln's argument that the lease in question violates I.C.C. regulations thus requiring the authorized carrier to provide liability insurance, must fail. While Lincoln's argument may be sound if federal regulations apply, the foundation of the argument—that the federal regulations are applicable—is simply not present. Without that foundation, the rest of the argument is immaterial. Within this argument, Lincoln contends that public policy supports the application of the I.C.C. regulations. 49 C.F.R. § 387.9 places the minimum financial responsibility for a motor carrier hauling non-hazardous property at $750,000. Because Pennsylvania requires a minimum of $15,000 in liability coverage, 75 Pa.C.S. § 1702, Lincoln believes the public policy of protecting innocent third parties requires the application of the higher limits. We disagree with this argument for two reasons. Lincoln's argument ignores 32 Pa.Code § 32.12 issued under the P.U.C., 66 Pa.C.S. §§ 501, 512, 1103(d), which requires property carrier liability insurance at a minimum amount of $300,000, not the $15,000 found in the Motor Vehicle Financial Responsibility Law.

¶ 22 Next, no matter the amount of liability insurance required, that amount has been determined under the direct authority of the Pennsylvania legislature. We cannot say that it is against the public policy of Pennsylvania to uphold the liability limits as set forth in either the Pennsylvania Code or statute.

■ ¶ 23 As we have determined the trip lease is not violative of any regulation, the terms of that lease may be applied to answer the next question. Was Wasson acting on behalf of Fenner at the time of the accident? It is not contested that Wasson was travelling to Fairless Hills in order to pick up a load for Fenner. However, the lease between Fenner and Wasson is clear in that Wasson alone was responsible for his actions up to the point he accepted the shipment. Therefore, by the express terms of the contract between Fenner and Wasson, Wasson was not acting under Fenner's authority at the time of the accident.

¶ 24 Wasson cannot be fairly said to have been operating his vehicle on behalf of Fenner at the time of the accident. As noted, Wasson was not under legal contract to Fenner as he traveled to Fairless Hills. Mirriam–Webster's Collegiate Dictionary defines "behalf" as in "the interest or benefit, in support or defense." [6] As Wasson was not actually under contract to Fenner at the time in question, he cannot be said to have been acting in their behalf. If acting in behalf of another is to be defined so broadly, as Lincoln wants, it is hard to imagine a time when the tractor-trailer would be operating under Lincoln's coverage, specifically issued to cover dead-heading and bobtailing, thus rendering Lincoln's policy largely illusory. As a result of the above, we find that Lincoln's business use exclusions for operation while under hire or on behalf of another do not apply.

---

**6.** The dictionary notes a difference between "in" behalf of another and "on" behalf of another. "On" behalf, as used in the Lincoln policy, means in support or defense of. "In" behalf means in the interest or benefit of. However, it is also noted that such distinction, outside of Britain, is largely ignored in actual usage.

¶ 25 Finally, Lincoln claims the nature of the claims require Liberty Mutual to assume the defense of Wasson. Lincoln is correct in asserting that "it is the duty of the insurer to defend until such a time as the claim is confined to a recovery that the policy does not cover." *Board of Public Education of the School District of Pittsburgh v. National Union Fire Insurance Co.*, 709 A.2d 910, 913 (Pa.Super.1998) (*en banc*). It must be remembered that this admonition applies equally to Lincoln. In filing its declaratory judgment action, Lincoln is asking the court to define the duty of the respective insurers, determining which policy does, as well as does not, cover the claim.

¶ 26 We first note that a fair reading of the complaint indicates that plaintiffs did not know the legal status between Fenner and Wasson and so named both as defendants. Further, it is evident from the wealth of information supplied in this action that only one of the two insurers can be responsible for providing Wasson's defense.

¶ 27 *Erie Insurance Exchange v. Transamerica Insurance Company*, 516 Pa. 574, 533 A.2d 1363 (1987) provides guidance on how to make that determination in light of the nature of the claims stated. There, an accident occurred when a 3½ year old child obtained the keys to a parked car, set the car in motion whereupon it rolled down a hill striking two children, killing one. The question then arose as to whether the automobile or homeowners policy was obligated to defend. Before the court could determine that issue, it needed to make a determination whether such a young child could actually "use" an automobile, thus triggering the auto insurance. Once the court determined a 3½ year old could not knowingly use an auto, it could then examine the complaint to determine whether the allegations fell within the homeowners' coverage. Similarly, here we are required to determine the legal status of the two trucking entities before we can examine the details of the complaint. We have done so, determining that Fenner had no legal connection to Wasson at the time of the accident, thereby rendering the Liberty Mutual policy inapplicable. Under the facts, as plead, in the complaint, this leaves the Lincoln General policy to provide the defense to Wasson [7].

¶ 28 Order affirmed.

---

[7]. This opinion has no effect upon the allegation found in the property damage case that Fenner was independently negligent in entrusting Wasson with the tractor trailer. Whether Liberty Mutual defends and/or indemnifies Fenner with regard to the allegation of negligent entrustment is not an issue before us. We have been asked to identify the proper insuring entity for Wasson, not Fenner.