IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Consolidated Rail Corporation,       :
                   Petitioner    :
                                 :
          v.                  :
                                 :
Pennsylvania Public Utility      :
Commission,                 :   No. 131 C.D. 2025
               Respondent   :   Argued: April 13, 2026


BEFORE:   HONORABLE ANNE E. COVEY, Judge
               HONORABLE LORI A. DUMAS, Judge
               HONORABLE STELLA M. TSAI, Judge

OPINION
BY JUDGE TSAI                 FILED: June 3, 2026


Consolidated Rail Corporation (Conrail) petitions for review of the declaratory order of the Pennsylvania Public Utility Commission (PUC) concerning Conrail's rights and obligations with respect to the inspection and maintenance of drainage facilities of a railroad bridge over Interstate 95 (I-95) in Philadelphia.  For the reasons set forth below, we vacate and remand.

## I. BACKGROUND

Conrail is a railroad company that owns and operates the Delair branch rail line, which passes over I-95 at an above-grade crossing on a two-span, riveted girder bridge known as the Delair Bridge.  Petition, ¶ 1, Reproduced Record (R.R.) 3a-4a.  On June 11, 2018, multiple motor vehicles collided on I-95 in the vicinity of the Delair Bridge.  *Id*., ¶¶ 16-17, R.R. 8a.  In ensuing lawsuits filed in the Court of Common Pleas of Philadelphia County (Philadelphia Litigation), the plaintiffs in those matters (Plaintiffs) alleged that ponding water on I-95, attributable to the failure by Conrail and the Pennsylvania Department of Transportation (PennDOT)

to properly inspect and maintain the drainage system on the Delair Bridge, contributed to the cause of the collisions. *Id*., ¶ 17, R.R. 8a.

After PennDOT took the position in the Philadelphia Litigation that Conrail bore responsibility for inspection of the Delair Bridge drainage system, Conrail filed the instant petition for declaratory order.[1]  *Id*., ¶ 18, R.R. 8a.  Specifically, Conrail sought to clarify Conrail's and PennDOT's rights and responsibilities pursuant to a January 17, 1966 order (1966 Order) approving the construction of a portion of State Highway Route 1000, later known as I-95, by PennDOT's predecessor, the Pennsylvania Department of Highways.[2]  *Id*., ¶¶ 4-8, R.R. 4a-6a.  At that time, Conrail's predecessor, the Pennsylvania Railroad Company,[3] operated freight and

---

[1] PUC is vested with exclusive jurisdiction to allocate costs and maintenance responsibilities associated with railroad-highway crossings to any concerned public utility, municipal corporation, or the Commonwealth. *Norfolk S. Ry. Co. v. Pub. Util. Comm'n*, 971 A.2d 545, 550 (Pa. Cmwlth. 2009); *see also* 66 Pa. C.S. §§ 2702(b) ("[PUC] is hereby vested with exclusive power . . . to determine and prescribe . . . the manner and conditions in or under which [rail-highway] crossings shall be maintained, operated, and protected to effectuate the prevention of accidents and the promotion of the safety of the public."), 2704(a) (setting forth general rule with respect to PUC's authority to allocate costs associated with rail-highway crossings).

[2] The portion of I-95 addressed in the 1966 Order was "Section D-1 of the new expressway[, which would] extend[] a distance of about 0.9 of a mile between Luzerne and Margaret Streets in the city and, at a location immediately south of Frankford Creek and west of Thompson Street."  1966 Order, at 1, R.R. 11a.  In addition to PennDOT and Conrail, the 1966 Order also addressed the rights and responsibilities of the City of Philadelphia and gas, electric, and telephone utility companies related to the highway construction project.

[3] Conrail explained in its petition:

> In 1968, the Pennsylvania Railroad and New York Central Railroad merged to become the Pennsylvania New York Central Transportation Company, effective February 1, 1968.  On May 8, 1968, it adopted the name Penn Central Company ("Penn Central").  [Conrail], established by Congress under the Regional Rail Reorganization Act of 1973, took over the operations of six bankrupt northeastern railroads, including Penn Central.  Conrail commenced operations on April 1, 1976.

Petition, at 2 n.2, R.R. 4a.  For ease of discussion, we refer to the Department of Highways and the Pennsylvania Railroad Company by their current names, except when quoting the 1966 Order.

2

passenger railroad service on the Delair branch, which crossed over Thompson Street in Philadelphia via an existing 50-foot rail bridge.  1966 Order, at 1, 3, R.R. 11a, 13a.  PennDOT sought PUC's approval for the relocation of Thompson Street and construction of an eight-lane expressway under the existing railroad right-of-way, the construction of a new rail bridge to span the expressway, and "the allocation of costs and expenses incident thereto."  *Id*., at 1-4, R.R. 11a-14a.

As described in the preamble of the 1966 Order, PennDOT proposed the construction of a temporary structure to allow rail traffic to continue for the duration of the project and a permanent, 167-foot railroad bridge to cross the finished expressway, *i.e.*, the Delair Bridge.  *Id*., at 3-4, R.R. 13a-14a.  Furthermore,

> [t]he department, upon completion of the improvement, will maintain State Highway Route 1000 and the roadway of Thompson Street between curbs.  **The department also will maintain the substructure of the railroad bridge but suggests that the railroad company should maintain the superstructure and the bearings of the bridge**.
>
> . . . . The railroad company will release damages for any of its operating right-of-way taken, injured, or destroyed by reason of the construction of the improvement.  The company, upon completion of the project, will maintain its altered and relocated facilities but does not agree to maintain any portion of the bridge structure carrying its tracks over the expressway.  The principal maintenance need for the superstructure of the bridge will be painting the bridge members and with the anticipated highway traffic of 110,000 vehicles daily on the highway the company avers that it will be practically impossible to paint the bridge or do any work that requires access from the expressway.  **We are of the opinion that the maintenance of the structure that will carry the facilities of the carrier should be the responsibility of the company and will so order**.

*Id*., at 5-6, R.R. 15a-16a (emphasis added).

With respect to the construction of the railroad bridge, PUC ordered as follows:

3

6. **That Department of Highways, at its initial cost and expense, furnish all material and do all work necessary to construct** the bridge over Frankford Creek, **the temporary and permanent railroad bridges over State Highway Route 1000**, their approaches, **and drainage facilities pertinent thereto** in accordance with the approved plans, and, in addition, relocate and reconstruct certain designated electrification structures, communication, and signal duct lines of the railroad company required to permit the construction of the improvement as shown on the approved plans.

*Id.*, ¶ 6, R.R. 17a (emphasis added). The 1966 Order also set forth the following obligations regarding the maintenance of the to-be-constructed Delair Bridge:

30. That upon completion of the construction of the crossing project and its opening to public use, The Pennsylvania Railroad Company, furnish all material and do all work necessary thereafter to maintain its tracks, catenary and transmission system, communication and signal system, and other facilities located on its right[-]of[-]way and, in addition, **maintain the entire superstructure including the fixed and expansion bearings of the new bridge** carrying its tracks over and above State Highway Route 1000.

. . . .

33. That upon completion of the construction of the crossing project and its opening to public use, Department of Highways, at its sole cost and expense, furnish all material and do all work necessary thereafter to **maintain the remainder of the crossing project, including the entire substructure of the new railroad bridge**, the substructure and superstructure of the bridge carrying State Highway Route 1000 over Frankford Creek, the paved roadway between curbs of relocated Thompson Street **and all drainage facilities pertinent to the improvement**.

*Id.*, ¶¶ 30, 33, R.R. 33a (emphasis added).

Conrail requested in its petition that PUC issue a declaratory order confirming PennDOT's obligation under the 1966 Order to inspect and maintain the drainage facilities of the Delair Bridge. PennDOT filed an answer requesting that the petition be denied. PUC directed that Conrail serve a copy of the petition on Plaintiffs in the Philadelphia Litigation. Plaintiffs filed an answer also seeking denial of the petition

4

or, in the alternative, that PUC find that the 1966 Order created a shared responsibility among Conrail and PennDOT to inspect and maintain the drainage facilities.  Plaintiffs noted that Conrail admitted in answers to interrogatories that it was responsible for ensuring the drainage system was draining water off the bridge and inspecting the drainpipe and Conrail's corporate designee testified in his deposition that a portion of the drainpipe was part of the bridge superstructure.  Plaintiffs' Answer, ¶ 7, Exhibit C, at 51, 64, Exhibit F, ¶¶ 26-27, R.R. 87a, 136a-137a, 152a.

On January 2, 2025, PUC issued an opinion and order, which granted Conrail's request for a declaratory order but found that Conrail, not PennDOT, bore responsibility for the Delair Bridge's drainage facilities.  Opinion and Order, at 12-13, R.R. 199a-200a.  PUC first found that the preamble and paragraph 30 of the 1966 Order clearly assigned Conrail the responsibility to maintain the bridge superstructure.  *Id*., at 11, R.R. 198a.  Next, PUC reasoned that Conrail benefits from the drainage of water and debris from the bridge and controls the drainage facilities, which are attached to the superstructure.  *Id*., at 12, R.R. 199a.

PUC further determined that the reference in paragraph 33 of the 1966 Order to PennDOT's responsibility for maintenance of drainage facilities applied only to relocated Thompson Street and not drainage for the entire highway and bridge project.  *Id*., at 12, R.R. 199a.  In support, PUC found the absence of an Oxford comma[4] in the phrase "the paved roadway between curbs of relocated Thompson Street and all drainage facilities pertinent to the improvement" indicates that the

---

[4] The Oxford (or serial) comma rule "requires a comma before a coordinating conjunction in a series with three or more items."  Marcello, David A., The Case of the Serial Comma: What Can Plain-Language Drafting Tell Legislative Drafters? 19 Scribes J. Legal Writing 127, 128 (2020).

drainage facilities referred to in paragraph 33 related to the Thompson Street improvement alone. *Id*.; 1966 Order, ¶ 33, R.R. 33a. PUC additionally observed that the singular reference to an "improvement" reflected the intention to assign PennDOT responsibility for one aspect of the overall project, that is, the drainage facility associated with the Thompson Street relocation. Opinion and Order, at 12, R.R. 199a.

## II. ISSUES ON APPEAL

Conrail filed the instant petition for review in this Court, raising two issues.[5] Conrail first argues that the declaratory order must be reversed because PUC disregarded the rules of construction set forth in the Statutory Construction Act of 1972 (Statutory Construction Act or Act)[6] when interpreting the 1966 Order. Second, Conrail contends that the determination that Conrail bears responsibility for maintenance and inspection of the Delair Bridge drainage facilities was contrary to the plain language of the 1966 Order that assigned this responsibility to PennDOT and was based on a faulty finding that Conrail exclusively benefits from and controls the drainage system.[7]

---

[5] For ease of analysis, we have condensed Conrail's second and third issues into one.

[6] 1 Pa. C.S. §§ 1501-1991.

[7] Conrail additionally asserts that Plaintiffs attached to their answer Conrail's "preliminary answers to interrogatories in the Philadelphia Litigation" and PUC "misleadingly conclude[d]" from those answers that Conrail admitted responsibility for the proper functioning of the drainage facilities. Conrail's Brief at 20 n.3; Plaintiffs' Answer, Exhibit F, R.R. 143a-60a. Conrail attached to its brief its supplemental interrogatory answers, in which it denied any such responsibility. Conrail's Brief, Addendum B.

Because Conrail failed to seek correction of the record or object to Plaintiffs' submission before the agency below, it has waived any challenge to the composition of the certified record in this Court. *See HIKO Energy, LLC v. Pa. Pub. Util. Comm'n*, 209 A.3d 246, 261 (Pa. 2019) (noting that "a party waives appellate review of a claim when it fails to raise the issue before an administrative tribunal rendering a final decision"). Moreover, we may not consider Conrail's

PUC and PennDOT[8] respond that the rules of statutory construction do not apply to PUC's interpretation of its own prior orders; instead, under established caselaw, this Court may not overturn PUC's interpretation of its orders unless the result is clearly erroneous, arbitrary, and lacks evidentiary support. PUC and PennDOT contend that, applying this deferential standard, this Court must affirm the declaratory order as it was based on the plain language of the 1966 Order, admitted facts, and PUC's expertise and experience in the matters of rail crossings.[9]

## III. DISCUSSION

### A. Standard of Review

Initially, we agree with PUC and PennDOT that our review is sharply constrained in this case and the rules of statutory construction are not applicable. Generally, our standard of review of a PUC order is limited to determining whether substantial evidence supports the necessary findings of fact and whether an error of

---

supplemental interrogatory answers attached to its brief, as our review is limited to the record certified by the agency. *Myers v. Pa. Pub. Util. Comm'n*, 306 A.3d 963, 968 n.3 (Pa. Cmwlth. 2023). In any event, we note that PUC cited Conrail's interrogatory answers in a footnote but did not expressly rely on the answers in determining Conrail's responsibility with respect to the drainage facilities. Opinion and Order, at 12 n.9, R.R. 199a. In its brief, PUC stated that it "relied upon the 1966 Order's plain language and only cited Conrail's [interrogatory answers] as additional support for its conclusion." PUC Brief at 28 (emphasis omitted).

[8] Plaintiffs initially filed a notice of intervention in this appeal but later withdrew, citing the settlement of the Philadelphia Litigation.

[9] PennDOT additionally asserts that Conrail sought clarification regarding the inspection **and** maintenance of the drainage facilities on the Delair Bridge, but the 1966 Order only assigned maintenance responsibility and did not address inspection of the facilities. Therefore, PennDOT contends that this Court may affirm PUC's determination in the first instance regarding inspection of the Delair Bridge's drainage facilities pursuant to its exclusive jurisdiction over rail-highway crossings. PennDOT Brief at 12 (citing 66 Pa. C.S. §§ 2702(b), 2704(a)). However, PUC did not premise its ruling on the distinction between inspection and maintenance responsibilities, nor did PUC assert that it was exercising its jurisdiction to assign responsibility to Conrail outside the scope of the 1966 Order. Therefore, we need not address PennDOT's alternate rationale for affirmance.

7

law, violation of constitutional rights, or violation of PUC's procedures occurred. *Borough of Middletown v. Pa. Pub. Util. Comm'n*, 301 A.3d 965, 974 (Pa. Cmwlth. 2023). However, we apply a more restrictive standard in cases where PUC construes its prior orders because, "as an administrative agency, [it] is peculiarly fitted to interpret its own orders." *Pittsburgh-Johnstown-Altoona Express, Inc. v. Pa. Pub. Util. Comm'n*, 554 A.2d 137, 144 (Pa. Cmwlth. 1989) (quoting *Del. Valley Transp. Co. v. Pa. Pub. Util. Comm'n*, 400 A.2d 678, 679 (Pa. Cmwlth. 1979)). "In recognition of this principle a court will not set aside a construction placed upon its own orders by [PUC] unless the result is clearly erroneous, arbitrary, and unsupported by evidence." *Id.* (quoting *Del. Valley Transp.*, 400 A.2d at 679); *see also Tenant Union Representative Network v. Pa. Pub. Util. Comm'n* (Pa. Cmwlth., No. 10 C.D. 2023, filed Apr. 2, 2024), 2024 WL 1395268, slip op. at 14 (same).[10]

Furthermore, PUC's authority to issue a declaratory order under the Public Utility Code (Code)[11] is entrusted to its "sound discretion." 66 Pa. C.S. § 331(f) ("[PUC], with like effect as in the case of other orders, and in its sound discretion, may issue a declaratory order to terminate a controversy or remove uncertainty."). When "evaluating the 'reasonableness' of any discretionary agency action, appellate courts accord deference to agencies and reverse agency determinations only if they were made in bad faith or if they constituted a manifest or flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions." *Lawrence v. Pa. Pub. Util. Comm'n*, 348 A.3d 108, 128 (Pa. 2025) (citation omitted). "When [PUC] disposes of an issue involving its special expertise and requiring the exercise of

---

[10] Unreported panel decisions of this Court issued after January 15, 2008, may be cited as persuasive authority. *See* Commonwealth Court Internal Operating Procedures § 414(a), 210 Pa. Code § 69.414(a).

[11] 66 Pa. C.S. §§ 101-3316.

discretionary judgment, absent an error of law or total lack of supporting evidence, the Court will not substitute its judgment for that of [PUC]." *United States Steel Corp. v. Pa. Pub. Util. Comm'n*, 850 A.2d 783, 790 (Pa. Cmwlth.) (*en banc*), *appeal denied*, 863 A.2d 1151 (Pa. 2004).

The cases Conrail cites in urging this Court to apply a *de novo* standard of review and consider the rules of statutory construction are inapposite, as each relates to PUC's interpretation of Code provisions and regulations enacted thereunder. *See McCloskey v. Pa. Pub. Util. Comm'n*, 255 A.3d 416, 423 n.13 (Pa. 2021) (noting that review of PUC's interpretation of a Code provision presented a pure question of law involving *de novo* review and applying provisions of Statutory Construction Act); *Popowsky v. Pa. Pub. Util. Comm'n*, 910 A.2d 38, 48 (Pa. 2006) (stating appellate issues pertaining to PUC's interpretation of Code provisions and regulations promulgated thereunder pose questions of law). Here, PUC was not called upon to interpret the provisions of the Code or any other statute or regulation but instead the provisions of the 1966 Order that allocated costs and responsibilities between PennDOT and Conrail for inspection and maintenance of the Delair Bridge. The Statutory Construction Act, by its express terms, limits its application to interpretation of statutes, regulations, and public documents that incorporate the Act and does not extend to interpretation of agency orders. 1 Pa. C.S. § 1502; *see also Pinto v. Workers' Comp. Appeal Bd. (Main Line Healthcare)* (Pa. Cmwlth., No. 739 C.D. 2018, filed Feb. 22, 2019), 2019 WL 855677, slip op. at 11 n.8 (declining to apply rules of statutory construction to interpret administrative order). Therefore, the deferential review applicable to PUC's interpretation of its own prior orders is the appropriate standard in this case. *See Chappell v. Pa. Pub. Util. Comm'n*, 425 A.2d 873, 875-76 (Pa. Cmwlth. 1981) (noting deferential standard of review when

addressing PUC's interpretation of its own orders but applying rules of statutory construction as PUC decision under review interpreted statutory exemption under the Code).

## B. Merits

Turning to the merits, Conrail argues that PUC erroneously narrowed the construction of the assignment to PennDOT of responsibility for "all drainage facilities pertinent to the improvement" in paragraph 33 of the 1966 Order to only drainage on Thompson Street. 1966 Order, ¶ 33, R.R. 33a. Conrail asserts that paragraph 33 constitutes a "'catch all' for maintenance duties not otherwise assigned" and is the only place in the 1966 Order where maintenance of drainage facilities is mentioned. Conrail's Brief at 18. Conrail contends that PUC ignored the plain meaning of "the improvement" used throughout the 1966 Order—in the singular—to refer to the entire crossing project addressed in the order, including the construction of State Highway Route 1000 (*i.e.*, I-95) underneath the railroad right-of-way and the alteration of the Thompson Street crossing under the then-existing rail bridge. Conrail further notes that paragraph 30, which delegated certain responsibilities to Conrail, did not mention drainage of the Delair Bridge and only assigned the company responsibility for maintenance of the bridge's superstructure and bearings. *Id.*, ¶ 30, R.R. 33a (providing that Conrail has responsibility to "maintain the entire superstructure including the fixed and expansion bearings of the new bridge carrying its tracks over and above" I-95).

Conrail also asserts that PUC erroneously found that the company exclusively benefits from the drainage facilities, as the company contends that the drainage facilities move water away from the bridge and I-95 and thus also benefit the public who uses the expressway. Conrail further argues that nothing in the 1966 Order

10

supports PUC's conclusion that the drainage system is part of the Delair Bridge superstructure and exclusively within Conrail's control. Rather, Conrail maintains that photographs and diagrams submitted to PUC by Plaintiffs show that the downspout from the bridge attaches to the substructure, which would place it within PennDOT's control. *See* Plaintiffs' Answer, ¶ 7, R.R. 86a.

After careful review, we are constrained to conclude that PUC's interpretation of the 1966 Order as assigning Conrail responsibility for inspection and maintenance of the drainage facilities on the Delair Bridge was clearly erroneous, arbitrary, and unsupported by evidence. *Lawrence*, 348 A.3d at 128; *Pittsburgh-Johnstown-Altoona Express*, 554 A.2d at 144. PUC relied on three portions of the 1966 Order in arriving at its determination: (1) the statement in the preamble of the order that PUC is "of the opinion that the maintenance of the structure that will carry the facilities of the carrier should be the responsibility of the [railroad] company and will so order;" (2) the assignment to Conrail in paragraph 30 of maintenance of the superstructure and bearings of the Delair Bridge; and (3) the assignment to PennDOT in paragraph 33 of maintenance of "all drainage facilities pertinent to the improvement," which PUC avers only applies to drainage for relocated Thompson Street based on the fact that this phrase was not set off by an Oxford comma. 1966 Order, at 6, ¶¶ 30, 33, R.R. 16a, 33a. Upon close examination of the text, none of the cited portions of the 1966 Order supports PUC's resolution of this matter.

First, the discussion of Conrail's responsibility for maintenance of the "the structure that will carry the facilities of the carrier" appears in the preamble of the 1966 Order, which sets forth the parties' positions on future maintenance responsibility for the Delair Bridge. PennDOT recognized its responsibility to maintain the substructure "but suggest[ed] that the railroad company should

11

maintain the superstructure and bearings of the bridge," while Conrail rejected future responsibility for "any portion of the bridge structure" due to the difficulties associated with performing repairs over an active highway. *Id*., at 5-6, R.R. 15a-16a. PUC sided with PennDOT. Accordingly, paragraph 30 specifically delineated Conrail's responsibility to "maintain the entire superstructure including the fixed and expansion bearings of the new bridge." *Id*., ¶ 30, R.R. 33a. Nothing in either the cited portion of the preamble or paragraph 30 reflects that PUC intended to assign Conrail any responsibility with respect to the drainage facilities of the new Delair Bridge.

By contrast, the 1966 Order twice designates PennDOT as having responsibility for the "drainage facilities pertinent" to the work contemplated by the order. In paragraph 6 of the order—which PUC entirely overlooks in its declaratory order analysis—PennDOT is made responsible to "furnish all material and do all work necessary to construct the bridge over Frankford Creek, the temporary and permanent railroad bridges over State Highway Route 1000, their approaches, and **drainage facilities pertinent thereto** in accordance with the approved plans." *Id*., ¶ 6, R.R. 17a (emphasis added). Notably, paragraph 6 does not discuss drainage facilities for Thompson Street[12] but rather solely addresses responsibility for construction of drainage facilities of the highway and rail bridges, including the as-yet-unbuilt Delair Bridge. Paragraph 33 then, using nearly identical language, assigns PennDOT responsibility for maintenance of "the remainder of the crossing project" not assigned to Conrail or any other party to the order, "**including the entire**

---

[12] The sole discussion in the 1966 Order of drainage of Thompson Street appears in paragraph 13 of the 1966 Order, which states that the City of Philadelphia, not PennDOT, shall "at its initial cost and expense, furnish all material and do all work necessary to relocate its 12-inch sanitary sewer line located in the bed of Thompson Street and required by reason of the construction of the improvement." 1966 Order, ¶ 13, R.R. 28a.

**substructure of the new railroad bridge**, the substructure and superstructure of the bridge carrying State Highway Route 1000 over Frankford Creek, the paved roadway between curbs of relocated Thompson Street **and all drainage facilities pertinent to the improvement**." *Id.*, ¶ 33, R.R. 33a (emphasis added).

PUC presents two textual arguments why the reference to "all drainage facilities" in paragraph 33 only pertains to drainage of relocated Thompson Street: the absence of an Oxford comma preceding the discussion of the drainage facilities and the reference to a singular "improvement." Neither claim withstands scrutiny. While PUC generally used Oxford commas in lists of three or more items in the 1966 Order, it did not do so on every occasion.[13] Even assuming PUC intentionally omitted the Oxford comma in paragraph 33, PUC ignores the logical conclusion of its argument, that it would have unintentionally omitted an "and" prior to the reference to the Thompson Street work.[14] Our review reveals that the 1966 Order consistently uses a conjunction—"and" or "or"—before the final item in every list of three or more items. Moreover, PUC repeatedly refers in the 1966 Order to the

---

[13] *See, e.g.*, 1966 Order, at 4-5 ("The department agrees to reimburse the company for the costs incurred in furnishing watchmen, flagmen and inspectors . . . ."), ¶ 23 (providing that PennDOT shall pay compensation "for property taken, injured or destroyed by reason of the construction of the crossing project in accordance with this order"), R.R. 14a-15a, 30a.

[14] Thus, if the Oxford comma was intentionally omitted in paragraph 33, an "and" should have been inserted as follows:

> 33. That upon completion of the construction of the crossing project and its opening to public use, Department of Highways, at its sole cost and expense, furnish all material and do all work necessary thereafter to maintain the remainder of the crossing project, including the entire substructure of the new railroad bridge, the substructure and superstructure of the bridge carrying State Highway Route 1000 over Frankford Creek, **[and]** the paved roadway between curbs of relocated Thompson Street and all drainage facilities pertinent to the improvement.

1966 Order, ¶ 33, R.R. 33a.

13

entirety of the contemplated rail-highway crossing project as "the improvement," in the singular.[15]  As Conrail explains, "there is not a single instance in the 1966 Order where . . . PUC refers to any one aspect of the total construction project governed by the 1966 Order as a singular improvement, or the individual portions of the project together as multiple improvements."  Conrail Brief at 9-10.

Therefore, our review of the plain text of the 1966 Order leads us to the inescapable conclusion that PUC assigned responsibility for maintenance of all drainage facilities associated with the rail-highway crossing—including the drainage facilities for the Delair Bridge—to PennDOT.  Paragraph 30 assigns Conrail maintenance responsibility for only the superstructure and bearings of the bridge and does not mention the drainage facilities associated with the bridge.  Paragraph 33, on the other hand, assigns PennDOT responsibility to "maintain the remainder of the crossing project, including the entire substructure of the new railroad bridge . . . and all drainage facilities pertinent to the improvement."  1966 Order, at 6, ¶ 33, R.R. 33a.  Read in the context of the entire 1966 Order, it is clear that the reference in paragraph 33 to "all drainage facilities pertinent to the improvement," encompassed all the drainage facilities for the full construction project, including the drainage for the Delair Bridge.  *Id.*

In its declaratory order, PUC also weighed Conrail's "control" of the drainage facilities and its receipt of benefits from the drainage of water and debris from the

_____

[15] *See, e.g.*, 1966 Order, at 2 ("It is estimated by the department that the average daily traffic that will use the new highway at the site of the improvement by 1975 will be 110,000 motor vehicles."), 5 ("The department, upon completion of the improvement, will maintain State Highway Route 1000 and the roadway of Thompson Street between curbs."), 8 ("City of Philadelphia has no objection to the construction of the improvement as proposed by the applicant."), ¶ 5 (ordering that "the following described properties be and hereby severally taken and appropriated for the purpose of the improvement in accordance with the plan attached hereto"), R.R. 12a, 15a, 18a, 21a.

14

bridge. Opinion and Order, at 12, R.R. 199a. PUC's consideration of such factors is within its special expertise as the exclusive arbiter of maintenance and operation of rail crossings. *Norfolk*, 971 A.2d at 550-51. PUC does not explain, however, how it took these factors into account when drafting the 1966 Order, which was the sole issue PUC addressed in the declaratory order. Notably, the 1966 Order is devoid of any discussion as to which party controls or receives the primary benefit from the drainage facilities. Similarly, we need not address the testimony of Conrail's and PennDOT's corporate designees in the Philadelphia Litigation regarding responsibility for inspection and maintenance of the drainage facilities where PUC did not rely on this testimony and the post-1966 practice and understandings of the parties were beyond PUC's purview.[16]

## IV. CONCLUSION

Accordingly, we vacate PUC's declaratory order assigning inspection and maintenance responsibility over the Delair Bridge drainage facilities to Conrail and remand with direction that PUC enter an order finding that the 1966 Order assigned such responsibilities to PennDOT.

_____
STELLA M. TSAI, Judge

---

[16] Our resolution of this appeal is without prejudice to PUC exercising its broad discretion in the matter of rail-highway crossings in a subsequent proceeding to **prospectively** reassign maintenance and inspection duties for the Delair Bridge drainage facilities.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Consolidated Rail Corporation, : 
                       Petitioner : 
                       : 
         v. : 
                       : 
Pennsylvania Public Utility : 
Commission, : 
                       Respondent :    No. 131 C.D. 2025

## **O R D E R**

AND NOW, this 3rd day of June, 2026, the January 2, 2025 order of the Pennsylvania Public Utility Commission (PUC) is hereby VACATED. This matter is remanded to PUC for further proceedings in accordance with this Opinion. Jurisdiction relinquished.

_____
STELLA M. TSAI, Judge